Robert L. MUSTO, et al.,
Plaintiffs–Appellees,

v.

AMERICAN GENERAL CORPORATION, et al.,
Defendants–Appellants.

Nos. 85–5865, 85–6092.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 17, 1986.

Decided Nov. 15, 1988.

Sidney O. Smith, Jr. (argued), William C. Humphreys, Jr., Philip C. Cook, Gregory C. Braden, Alston and Bird, Atlanta, Ga., Thomas H. Peebles, III, Trabue, Sturdivant and DeWitt, Nashville, Tenn., for defendants-appellants.

Douglas R. Pierce, King & Ballow, R. Eddie Wayland (argued), Robert L. Ballow, Nashville, Tenn., Leonard R. Page, Detroit, Mich., for plaintiffs-appellees.

Before NELSON and RYAN, Circuit Judges, and ENSLEN, District Judge.[*]

DAVID A. NELSON, Circuit Judge.

In addition to providing a pension plan under which their retired employees are paid lifetime annuities, the National Life and Accident Insurance Company and its affiliates have, since 1939, maintained group insurance coverage for both active and retired employees. The coverage includes life insurance, accidental death and dismemberment insurance (for active employees only) and, since 1945, medical insurance.

The group insurance has always been amendable at any time, and amendments have not been uncommon. Some of the amendments that were made over the years affected employees who had already retired, and others did not. Sometimes active employees were required to contribute part of the cost of one or more of the coverages they received, and sometimes they were not. In some years retirees who were younger than 65 had to pay part of the cost of their medical insurance, and in other years they did not. At no time between 1945 and 1984, however, was any retired National Life employee required to pay anything for medical insurance after age 65.

The cost of medical insurance was relatively low for several decades, and the level of insurance coverage historically provided by National Life was also low by today's standards. Not until 1971 was the dollar limit on the aggregate medical benefits payable over the entire course of an employee's retirement years raised from $5,000 to $10,000. Since that time, both costs and coverages have changed dramatically. The aggregate limit is now $200,000, for example, and in the first half of the current decade the cost of the medical insurance component of the group coverage increased by some 400 percent.

[*] Honorable Richard A. Enslen, United States District Judge for the Western District of Michigan, sitting by designation.

National Life and its parent holding company were acquired by defendant American General Corporation in 1982, and effective January 1, 1984, National Life employees were brought under a new medical insurance program comparable to American General's. That program, which was contributory as far as active employees were concerned, required all National Life employees who retired after January 1, 1984, to contribute approximately 20% to 25% of the cost of their medical insurance. Such retirees were given a choice of different coverages, for which different charges were imposed.

The new program was soon changed again; effective July 1, 1984, a revised medical insurance plan, applicable without regard to retirement date, eliminated the choice of coverages and required all participating retirees who had reached age 65 to pay $16.10 per person per month. This was one-half the total cost of providing private medical insurance for people who, because they were 65 or older, qualified for the federal government's Medicare program. The plan provided that on July 1, 1985, the contribution level for early retirees (those under age 65) would increase from $14.87 per month (25% of total cost) to $29.75 (50% of total cost). The required contribution would drop back to $16.10 when the retiree reached the age of 65. The amendments also included an "escape clause" under which an early retiree who was eligible for medical coverage under another employer's plan would not be eligible under defendant's plan.

Contending, in essence, that each retired National Life employee had been given a vested contractual right to veto any change in his medical insurance, including any change respecting contributions toward the cost of the coverage, several retired employees brought a class action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001–1461. Regardless of when they had re-

tired, the plaintiffs sought to freeze their medical insurance coverage at the configuration that applied to them on June 30, 1984.

In addition to challenging the changes in their medical insurance, the plaintiffs sought to block an unrelated change involving pension benefits for spouses.

After conducting a four-day evidentiary hearing, the district court certified the case as a class action and issued a preliminary injunction which, among other things, restrained the defendants from implementing the July 1, 1985 medical insurance premium increase for retirees under age 65. See *Musto v. American General Insurance Corp.*, 615 F.Supp. 1483, 1494 (M.D.Tenn. 1985). The defendants sought guidance on how the order was to be carried out, and the district court thereafter issued a supplemental order amending the definition of the class and giving instructions on implementation of the preliminary injunction. The defendants perfected separate appeals from the supplemental order and from the original injunction and class certification. The appeals have been consolidated.

The most significant of the several questions we are called upon to decide is whether the district court abused its discretion in issuing a preliminary injunction against implementation of the 1985 change in the medical insurance program.[1] Having concluded, for reasons explained below, that the plaintiffs failed to sustain their burden of showing the requisite likelihood of success on their claim that the changes in medical insurance coverage were impermissible, we shall reverse the order in which the injunction was granted.

I

Our starting point for determining the plaintiffs' rights under the group insurance policies is the actual language of the policies. ERISA requires that "[e]very employee benefit plan ... be established

---

**1.** Although implementation of the 1984 changes was not enjoined, the district court's opinion indicates that the court did not believe that any National Life employee who retired before 1984 could be required to make any contribution toward the cost of his medical insurance unless "the financial base of the entire corporation" were threatened. *Musto*, 615 F.Supp. at 1500. Defendants do not assert that such a threat exists.

and maintained pursuant to a written instrument." 29 U.S.C. § 1102(a)(1). A program under which an employer provides medical insurance benefits constitutes such a plan, see 29 U.S.C. §§ 1002(1)(A) and (3), and the insurance policy, in this case, is the "written instrument" required by law. (National Life's "Retirement Plan," under which the plaintiffs receive their pensions, is a separate plan, established and maintained pursuant to a separate written instrument; ERISA gives employees "vested" (non-terminable) rights in the retirement plan, but not in the group insurance plan.[2])

The insurance policy that was in effect when most members of the plaintiff class retired is National Life and Accident Policy Number G7166, a "contributory" group insurance policy issued in 1966. The 1966 policy, which replaced one issued in 1955, remained in effect, subject to various amendments, until January 1, 1984.

The 1966 policy provided three different types of insurance coverage for active National Life employees: life, accidental death, and medical. Article 2 of the policy says that insurance of an employee under any of these three coverages "shall cease immediately" upon

"(a) the date of the termination of employment of the Employee, except as provided in Section 5.07,

(b) the date on which the Employee fails to make a required premium contribution for the coverage,

(c) the date of termination of such coverage, or

(d) the date of termination of this Policy."

Article 5 of the policy contains the medical insurance coverage. Section 5.07, captioned **"Insurance After Retirement,"** says that "[a]fter the Retirement of an Employee insured hereunder, Group Comprehensive Medical Expense Insurance shall be continued on such Employee ... and, subject to the provisions set forth below, benefits shall be payable under the same conditions as those applicable in the case of an insured Employee."

Insured employees are required by Article 6 to make periodic contributions to the cost of all three of the coverages provided by the policy. Originally, retired employees who had not reached the age of 65 were required to make premium contributions for medical coverage just as active employees were. That requirement did not extend to retirees aged 65 or older. Under an amendment that became effective on April 1, 1973, the contribution requirement for medical insurance was ended—temporarily, as it turned out—with respect to all employees, active or retired. A few months later a contribution requirement was reintroduced for medical coverage on the dependents of new employees. These policy amendments, like all other policy amendments, were made known to the members of the group by duly published announcements.

Article 7 of the group insurance policy contains several **"General Provisions,"** one of which (§ 7.02) obligates the company to "issue for delivery to each insured Employee an individual certificate setting forth the benefits to which such Employee is entitled under this Policy ...." These certificates, § 7.02 says, "shall not constitute a part of this Policy."

Section 7.08 of the General Provisions, captioned **"Modification or Discontinuance of Policy,"** contains the following important language:

"This Policy, or any insurance coverage hereunder, may be amended or discontinued at any time by an announcement duly published by the Company. The Company reserves the right to determine new premium contributions from

---

**2.** *Musto,* 615 F.Supp. at 1496 and 1497. A medical insurance plan comes within the statutory definition of a "welfare plan," 29 U.S.C. § 1002(1)(A), and does not come within the statutory definition of a "pension plan." 29 U.S.C. § 1002(2)(A). ERISA establishes minimum vesting standards for *pension* benefits, making some of such benefits non-terminable, 29 U.S.C. § 1053, but Congress declined to make *welfare* benefits non-terminable. *In re White Farm Equipment Co.,* 788 F.2d 1186, 1191 (6th Cir.1986). The difference between retiree pension plan benefits and retiree welfare plan benefits is thus a "crucial" one. *Id.* at 1193.

time to time and at any time. Termination of this Policy, or any insurance coverage hereunder, or any amendments hereto shall not require the consent of any Employee or beneficiary, nor shall such action require individual notice to any such person. Only the President, a Vice–President, the Secretary or an Assistant Secretary has power on behalf of the Company to make or modify this contract of insurance."

Section 7.11, captioned **"Entire Contract,"** says that "[t]his Policy and the individual applications of the Employees insured hereunder shall constitute the entire contract."

Nowhere in the entire contract is there any prohibition against amendments requiring premium contributions from retirees for whom no contribution requirement was in effect at the time of retirement, or from retirees whose contribution requirement ended upon their reaching age 65. What the policy says, rather, as we have seen, is that "[t]he company reserves the right to determine new premium contributions from time to time and at any time." If there is any ambiguity in this sentence, we have not been able to detect it.

■ The plaintiffs suggest that there is a negative pregnant in the next sentence of § 7.08, which declares that amendments to the policy "shall not require the consent of any Employee or beneficiary...." Because the words "Retired Employee" are not used, plaintiffs argue, there is an implication that the consent of retired employees is required for amendments that affect them. This implication is strengthened, according to plaintiffs, by the fact that § 2.06 provides for termination of coverage when an "Employee" fails to make a required premium contribution, but not when a "Retired Employee" fails to make a required premium contribution.

We are not persuaded. The very section that provides for continuation of medical coverage for an employee after he or she has become a retired employee says that the coverage "shall be continued on such Employee;" the term used is "Employee," not "Retired Employee." Section 5.07 makes post-retirement benefits payable, moreover, *"under the same conditions as those applicable in the case of an insured Employee."* (Emphasis supplied.) If an active employee fails to make a required premium contribution, his coverage ceases automatically, under § 2.06, and no benefits are payable. If a 62 year-old retiree fails to make a required premium contribution, therefore, under the original policy, no benefits are payable to him either—and the fact that the term "Retired Employee" is not used in § 2.06 makes absolutely no difference. To interpret § 7.08 of the policy as implying that a retired employee must give his consent before the company exercises its reserved right to determine new premium contributions as to that employee would be unwarranted, in our view.

A new group medical insurance policy replaced the medical coverage of the 1966 policy effective January 1, 1984. The replacement policy is equally unambiguous as far as the company's right to amend is concerned. Here is what the general provisions of that policy say:

"This policy may be amended or changed at any time, subject to the laws of the jurisdiction in which it is delivered, by written agreement between the Policyholder and the Insurance Company, without the consent of the persons insured hereunder or of their beneficiaries, if any."

The "Insurance Company" referred to in this provision is, by policy definition, The National Life and Accident Insurance Company (now, by change of name, American General Life and Accident Insurance Company). The "Policyholder" referred to is the same company, together with any subsidiaries and affiliates named in the policy. It is thus clear, as far as the 1984 policy language is concerned, that if the company decides to amend or change the policy, it may do so "at any time," subject to the laws of Tennessee, "without the consent of the persons insured...."

## II

Group insurance policies are not normally distributed to individual members of the group, but ERISA gives any beneficiary a

statutory right to obtain a copy upon request—and the statute authorizes the imposition of substantial penalties for failure to comply with such a request in timely fashion. 29 U.S.C. §§ 1024(b)(4) and 1132(c). National Life employees were told in booklets distributed in accordance with the requirements of ERISA that they could examine the official plan documents during normal working hours and could obtain copies upon request.

Moreover, each insured employee of National Life automatically received an "individual certificate of insurance" in accordance with § 7.02 of the policy. The form of individual certificate of insurance applicable to active employees certifies that the employee is insured for designated coverages "in accordance with and subject to the conditions, definitions and provisions of Group Policy Number G7166." Page one of the individual certificate goes on to state, under the catchline "**Termination of Insurance**," that insurance of an employee under any of the coverages provided by the group policy ceases automatically on termination of employment, with certain exceptions, or on "the date on which the employee fails to make a required premium contribution for the coverage; (c) the date the coverage is terminated by the Company; or (d) the date of termination of the Group Policy." The portion of the certificate dealing specifically with medical insurance says that medical insurance benefits similar to those described in the certificate are provided "on a limited basis" to retired employees who had medical coverage prior to their retirement. Nothing in the certificate suggests in any way that the company will be foreclosed from ever imposing new charges or from increasing charges already imposed for the medical coverage provided to retired employees.

The form of individual certificate issued to an employee upon his retirement likewise certifies that the retired employee is insured for designated coverages "in accordance with and subject to the conditions, definitions, and provisions of Group Policy Number G7166." Under the catchline "**Termination or Modification of Insur-**

ance," the retiree's individual certificate expressly provides as follows:

"The Group Policy, or any insurance coverage thereunder, *may be amended or discontinued at any time, and the Company reserves the right to determine new premium contributions at any time. Insurance under a coverage provided by the Group Policy ceases automatically* on the earliest of the following dates: (a) the date of death of the Retired Employee ... (b) *the date the coverage or the Group Policy is terminated by the Company; or (c) with respect to Comprehensive Medical Expense Insurance* provided by the Group Policy, the date on which the last Aggregate Benefit limit shall have accrued or *the date on which a required premium contribution is not made.*" (Emphasis supplied.)

The certificates of insurance were not the only documents distributed to members of the plaintiff class. From 1969 to 1982, National Life sent each employee an annual "Benefacts Report," or "personal statement of benefits." Each such report noted that it "was prepared by Benefacts, Inc., a consulting firm specializing in the preparation of personalized reports on company benefit programs." Subject to the caveat that "the amount and availability of benefits are controlled by the terms and conditions of each plan," each Benefacts Report presented a skeletal summary of the employee's current medical insurance benefits, disability insurance benefits, and life insurance benefits. The report also gave a dollar figure for the employee's estimated monthly pension upon retirement at age 65, and noted that medical and life insurance benefits would continue after retirement subject to certain reductions in amount. The brief discussion of post-retirement benefits concluded with a statement—perfectly accurate at the time—to the effect that "[y]ou are not required to contribute for these benefits after your retirement." The Benefacts Report said nothing one way or the other about the possibility of future amendments regarding insurance benefits.

That possibility was specifically and clearly addressed in a series of employee

booklets intended, as some of the early booklets put it, to explain the company's benefit program "in easily understood terms." The first such booklet provided us with respect to the 1966 group insurance policy came out in 1968. That booklet, prepared for distribution to all employees, says on its first page that "[c]omplete provisions and conditions are contained in the master group policy, which is the final authority in all situations." Under the caption "**Continuation of the Program**," the last page of the booklet says this:

"The Group Insurance provisions of the Security Program have been arrived at after careful study, and it is the Company's expectation that they will be continued indefinitely. However, since it is not possible to foresee the future, the Company must reserve the right to change or even discontinue these provisions if it becomes necessary."

As to post-retirement medical insurance coverage, the 1968 booklet summarizes the provisions of the policy as follows:

"After your retirement, Comprehensive Medical Expense Insurance coverage will continue on you, and on your spouse if your spouse has been continuously covered during the five-year period immediately preceding your retirement. There will, however, be new limitations on the total amount of benefits that will be paid.

If you are 65 years of age when you retire, the total amount of benefits for your covered expenses thereafter may not exceed $5,000.

\* \* \* \* \* \*

Contributions for yourself and your spouse, separately computed, are required to your respective 65th birthdays, at which time contributions cease. Benefit limits applicable after your retirement cannot be reinstated."

This is an accurate summary of policy provisions in effect at the time the booklet was issued.

By 1977 ERISA had made it mandatory for the administrator of a welfare plan such as National Life's to furnish each participant a "summary" description of the plan, "written in a manner calculated to be understood by the average plan participant...." 29 U.S.C. §§ 1022(a)(1) and 1024(b)(1). National Life's statutory "summary plan description" for 1977—a summary set forth in a booklet similar to those the company had been distributing voluntarily for some years—appears to meet the statutory requirements.

Under the catchline "**Plan Documents**," the 1977 summary says this:

"This description of the Plan summarizes the official Plan Documents. We have tried to write this summary in clear[,] understandable and informal language. However, you should refer to the official Plan Documents for more extensive information about your benefits. In the event of any conflict between the information in this summary and the official Plan Documents, the official Plan Documents will govern.

You are entitled to examine the official Plan Documents \* \* \* during normal working hours at the Security Program Division of the Plan Administrator. If you would rather have a copy of these documents, send a written request to the Plan Administrator. There will be a charge to cover copying costs."

Immediately preceding this language in the 1977 booklet is a paragraph captioned "**Continuance of Plan**." It reads as follows:

"The Company fully intends to continue the Plan indefinitely and to meet any foreseeable situations that may occur. However, the Company does, as it always has, reserve the right to change the Plan and, if necessary, discontinue it."

The 1977 booklet's summary of the post-retirement medical insurance provisions then in effect is similar in format to that contained in the 1968 booklet, but it reflects several intervening changes in the terms of the policy. By 1977,

— coverage for a spouse was no longer conditioned on the spouse having been continuously covered for the five years preceding retirement;

— the aggregate limit on a retiree's post-retirement benefits was not $5,000, but $100,000; and

— contributions were no longer required from retirees under the age of 65; regardless of age, as the summary stated, "[n]o contributions are required for continued coverage on you and your spouse after retirement."

The 1977 booklet appears to provide an accurate summary of the policy provisions then in effect.

The final summary we have been furnished is the 1981 summary plan description of the group medical insurance plan for retired employees. Under the catchline "**Contributions to the Plan**," the 1981 summary says "[t]he Company pays the entire cost of the Plan with respect to Retired Employees." On the same page, under the catchline "**Continuance of Plan**," the 1981 summary reiterates, in language unchanged since 1977, that

"[t]he Company fully intends to continue the Plan indefinitely and to meet any foreseeable situations that may occur. However, the Company does, as it always has, reserve the right to change the Plan and, if necessary, discontinue it."

### III

Because the summary plan description booklets were distributed to everyone, while the actual policy was not, a person who had not spent years in the insurance business, or who failed to read the booklets carefully, might have assumed that the legal obligations incurred by National Life under the insurance policy were defined not by the language of the policy itself, but by the booklets in which the policy was summarized. Such an assumption would conflict with what is said in the booklets ("the official Plan Documents will govern"), it would conflict with what is said in the policy ("[t]his Policy ... shall constitute the entire contract"), and it would seem to conflict with what is said in ERISA (the plan must be established pursuant to "a written instrument," of which the participants are to be furnished a "summary").[3]

The district court itself may have come close to thinking that the *fons et origo* of the company's obligations under its group insurance plan lay in the summaries, and not in the instrument being summarized. Acknowledging that "a right to change or terminate medical and life insurance appeared in the official master plan documents or policies," the court dismissed the "official" documents in a single sentence: "These documents, however, were not distributed to employees, nor were they readily available."[4] 615 F.Supp. at 1488. The court then turned to the summary plan descriptions, and found their provisions to be in irreconcilable conflict:

"The termination/modification clause contained in the [National Life] summary plan descriptions clearly and expressly reserve[s] the right to amend and terminate the medical insurance benefit plan. At the same time, however, the plan descriptions also promise to continue the plans after the plaintiffs' [sic] retired, without further cost to the retiree. The Court cannot read both provisions together without reaching the conclusion that the provisions conflict and require interpretation of what the parties mutually intended by placing the terms in the agreement. As stated in [*International*

---

**3.** *Cf. Bryant v. International Fruit Products Co.*, 793 F.2d 118, 123 (6th Cir.) ("the handbook is not a part of the plan agreement and cannot be relied upon to modify or affect any provision of the plan...."), *cert. denied*, 479 U.S. 986, 107 S.Ct. 576, 93 L.Ed.2d 579 (1986). But see *Edwards v. State Farm Mutual Automobile Ins. Co.*, 851 F.2d 134 (6th Cir.1988), holding that the trustees of a pension plan acted arbitrarily and capriciously in denying disability benefits to an employee who was eligible for such benefits under the language of a summary plan description, but not under the language of the plan itself.

**4.** It is true that the complete policies were not distributed to employees who did not request them; under ERISA, there was no requirement that the master plan documents or policies be distributed to employees who had not asked for them. If the policies were not "readily available," however, National Life was violating ERISA. The court cited no facts that would support such a conclusion.

*Union v. Yard–Man Inc.,* 716 F.2d 1476 (6th Cir.1983), *cert. denied,* 465 U.S. 1007, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984) ], the agreement's terms must be construed to avoid nugatory and illusory promises. To read the plan as providing lifetime paid up medical insurance and, at the same time, reserving the right to terminate the benefits at any time constitutes an illusory promise—an express unqualified grant of a right negated by an express unqualified reservation of the right to terminate the grant." 615 F.Supp. at 1499.

■ Regardless of how much weight should be given to the language of the plan summaries, as opposed to the language of the insurance policies themselves, it seems to us that the district court erred, as a matter of law, in determining that the provisions of the plan summaries cannot be reconciled with one another. Our understanding of what the summary plan descriptions say is this:

1. Here is a plain-English summary of the group insurance plan for employees of National Life.

2. The plan provides medical insurance coverage for eligible employees.

3. The plan provides for continuation of medical coverage after retirement.

4. The plan does not require contributions for continued medical coverage after retirement.

5. The company reserves the right to change the plan.[5]

To read this summary as saying that the plan can never be changed in such a way as to to mandate retiree contributions for continued medical coverage is to read into the summary something its authors did not put there (a promise to provide lifetime "paid up" medical insurance), while reading out

of the summary something that clearly was put there (an express reservation of the right to change the plan). Such a reading violates the basic principle that each provision of a contract should be interpreted as part of an integrated whole, to the end that *all* of the provisions may be given effect if possible. See *Yard–Man,* 716 F.2d at 1479.

Wherein lies the supposed conflict in the summary plan description booklets?

— Each booklet, as far as we can see, did accurately summarize the main features of the group insurance policy as in effect at the time the booklet was issued;

— The group insurance policy did, at all times, provide medical coverage for eligible employees;

— The policy did, at all times, provide for continuation of medical coverage after retirement;

— Medical coverage was in fact continued for each retiree, regardless of insurability, as long as the retiree complied with the conditions of the policy;

— When the policy called for contributions from certain retirees, as it did in the 1960s, the booklets said so. When the policy did not call for contributions from any retiree, the booklets said that too. No booklet ever said that the policy would not be changed in the future to require contributions for continued coverage,

— and when the company made such a change in 1984, it was doing something that the booklets had said all along it had the right to do.

## IV

Although the contract of insurance clearly permitted amendments, and although

---

5. The 1968 booklet might conceivably be read as saying that the company reserves the right to change the plan "if it becomes necessary," while subsequent versions of the booklet contained no such qualification on the right to change the plan. This minor change in wording has little or no significance, in our view; it antedated major policy changes of which the plaintiffs want to take advantage, it brought the booklets into better alignment with the actual language

of the policy, and it did not materially affect the company's expressly reserved right to amend the policy. The 1968 version of the booklet cannot fairly be read as saying that the company reserves the right to change or even discontinue the policy only if it becomes necessary to do so in order to avoid bankruptcy or some comparable threat to the financial base of the entire corporation.

welfare plans, as distinguished from pension plans, are not subject to the "vesting" provisions of ERISA, it remains to be considered whether National Life's retirees were the beneficiaries of separate unilateral contracts under which National Life was estopped from exercising its right to amend the insurance coverage. The plaintiffs argue forcefully that each National Life employee did become the beneficiary of such a unilateral contract upon retirement. The district court, expressing agreement with the analysis found in "a case remarkably close on point," *In re White Farm Equipment Co.*, 42 B.R. 1005 (N.D.Ohio 1984), accepted the plaintiffs' argument. *Musto,* 615 F.Supp. at 1498. The *White Farm* judgment was subsequently reversed by this court, however, in a decision reported at 788 F.2d 1186 (6th Cir.1986), and under our holding in *White Farm,* it appears most unlikely that the plaintiffs in the case at bar will ultimately prevail on their principal claim.

The central issue raised in the *White Farm* appeal was "whether under ERISA an employer may lawfully exercise a reserved power to terminate an employee welfare benefit plan for retired nonunion employees." 788 F.2d at 1190. After distinguishing the pre–ERISA case of *In re Erie Lackawanna Railway Co.*, 548 F.2d 621 (6th Cir.1977), and noting that after ERISA "we are not bound to follow the Ohio law construed there," we concluded that where the power to terminate such a welfare plan has been reserved, it may be exercised: "the parties may themselves set out by agreement or by private design, as set out in plan documents, whether retiree welfare benefits vest, or whether they may be terminated." 788 F.2d at 1192 and 1193. We went on to hold that "the district court erred in ruling that an employer may not terminate, as a matter of 'federal common law' under ERISA, the welfare benefits of its retired employees," and we remanded the case for consideration of the question whether an agreement or "private design" set out in the governing plan document provided for the vesting of welfare benefits on retirement, or provided that such benefits could be terminated. 788 F.2d at 1193–

94. (The governing plan document was not available in *White Farm,* and its terms could only be shown through indirect evidence.)

Although the "plan document" required by 29 U.S.C. § 1102(1) was not before us in *White Farm,* such a document is before us in the case at bar. As we have seen, the document is unambiguous; instead of providing that the company may never require a premium contribution for medical coverage after retirement, the plan document provides just the opposite. As far as the plan itself is concerned, it is perfectly clear that no immutable insurance benefits can be said to vest upon retirement.

Whether, under ERISA, employees can ever obtain vested rights in welfare plan benefits on the strength of written representations outside the official plan document is a question we need not decide—for none of the "unofficial" documents called to our attention promised that all of an employee's medical insurance premiums would be fully and permanently "paid up" upon retirement, regardless of how the medical insurance policy might be amended thereafter. If any document furnished to any employee or any prospective employee represented that medical insurance benefits would be "irrevocable or permanently fully 'paid up' by the employer" after retirement (see *Musto,* 615 F.Supp. at 1486), that document has not been included in the record of this case.

It is true that National Life promoted its employee benefit package—which included a retirement plan component—as an inducement for people to come to work for the company and to remain in its employ. A recruiting brochure received in evidence as Exhibit 21, for example, told the prospective employee that he or she would have group life insurance "[f]rom the very first day at work;" that "[y]ou and your eligible dependents are all covered under an excellent comprehensive medical expense insurance plan" for which "[t]here is no cost to the employee unless you elect coverage on your dependents;" and that "[i]f you're disabled and can't work, your income continues" under disability cover-

age. The brochure then turns to the subject of retirement—and the discussion of that subject is confined entirely to a description of the *pension* benefits available under the company's *retirement plan.* The description of the retirement plan—a description that concludes with the words "The Company pays all the cost[; it's] National Life's way of saying 'thank you' for years of loyal service, and we think it's a good way"—says nothing whatever about post-retirement medical insurance or life insurance coverage. No insurance benefits were provided under the retirement plan, of course, and the recruiting brochure does not even tell the prospective employee that under the welfare plan medical coverage will be continued after retirement, much less promise that post-retirement medical coverage will be "irrevocable" or "permanently fully 'paid up.'" And under ERISA, as we have seen, the fact that an employee acquires a vested, non-terminable right to *pension* benefits such as those described in Exhibit 21 does not in any way suggest that the employee acquires a comparable vested right to medical insurance benefits under a *welfare* plan that does not provide for the vesting of such benefits.

Once an individual was hired by National Life, he or she received copies of a magazine put out by the company for its employees. Plaintiffs invite our attention to one issue of that magazine, different editions of which were received in evidence as Exhibits 8 and 9; this issue was devoted to a review of the employee benefit package as it stood in the summer of 1970. The magazine gave a lengthy description of the National Life "Retirement Plan"—the *pension* plan, which the magazine called "[t]he backbone of your total Security Program" —and the magazine reported that employee contributions were no longer required for this retirement program:

> "Of particular note is the fact that, beginning January 1, 1969, no contributions are made to the retirement program by employees. The entire cost of the Retirement Plan is paid by National Life."

As far as medical insurance coverage was concerned, in contrast, the magazine made it clear that contributions were still required from one class of retiree:

> "After your retirement, comprehensive medical expense insurance coverage will continue on you and on your covered spouse. There are, however, limitations on the total amount of benefits that will be paid.
>
> If you retire at age 65, the total amount of benefits for your covered expenses thereafter may not exceed $5,000.
>
> \*　\*　\*　\*　\*　\*
>
> Contributions for yourself and for your spouse are required to your 65th birthdays, at which time contributions cease."

Nowhere in that or any other employee publication—or in any memorandum, letter, brochure, report, or other written document, as far as we have been able to ascertain after a careful search of the record—did the company ever promise any employee that all premiums for post-retirement medical coverage would be irrevocably "paid up" upon the employee's retirement.[6]

What employees may have been told orally is harder to reconstruct, of course, but the memories of the witnesses should have been relatively fresh as to more recent oral communications. In October and

---

6. The employer may have gone farther in this direction in *Moore v. Metropolitan Life Insurance Co.,* 856 F.2d 488 (2d Cir.1988), where various employee newspaper articles, letters, memoranda, and film strips described the company's welfare plans as providing "lifetime" benefits "at no cost." Notwithstanding these written presentations—which did not generally refer to the company's right to amend or terminate benefits—the court held that there was no unilateral "contract" for lifetime benefits at no cost.

Like the record in the case at bar, the record in *Moore* contained "no hint of bad faith, intent to deceive or even conduct that was objectively, if unintentionally, misleading...." *Id.* at 492. Affirming a grant of summary judgment for the employer, the court of appeals declared in *Moore* that "the unambiguous provisions of the plan must govern, because altering a welfare benefit plan on the basis of non-plan documents and communications, absent a particularized showing of conduct tantamount to fraud, would undermine ERISA." *Id.* at 489.

November of 1983, a series of employee meetings was held across the country to tell National Life Employees about the prospective integration of their welfare and pension plans with the American General plans. We are given to understand that the majority of the more than 2,000 people in the plaintiff class had already retired by the fall of 1983, and they were not asked to attend the meetings.[7] Active employees who attended the meetings were given a description of the American General benefit programs and were told that they would come under those programs—which were contributory—if they remained in active service past January 1, 1984.

As far as their *pension* rights were concerned, the National Life employees were told that they would automatically become members of the American General Retirement Plan on January 1. To assure that no vested pension benefits would be lost, however, benefits at retirement would be calculated two ways: under the National Life pension plan's formula, and under the American General pension plan's formula. The retiring employee would receive the larger of the two amounts, thus getting "the best of both worlds."

As far as *medical insurance* coverage was concerned, the National Life employees were told that on January 1, 1984, they would have coverage under the American General medical plan of their choice if they completed the appropriate enrollment forms and paid the required contribution. Anyone retiring before January 1 would continue to have coverage under the existing National Life medical scheme. The people conducting the meetings apparently did not volunteer, as one would certainly have expected them to do, that coverage changes were in the offing, or that contributions might be required starting July 1; but the district court found that if asked a specific question about the possibility of termination (or, presumably, modification), the people running the meetings did mention the termination clause. *Musto*, 615 F.Supp. at 1490. (As it turned out, a person who retired prior to January 1 to save medical insurance costs would at least have been no worse off in that regard than if he had retired six months later; the early retiree had to make no contributions until July 1, 1984, and after that date the same contributions were required from all retirees of the same age, regardless of retirement date.)

Nowhere in the district court's opinion is there a specific finding that any National Life employee received an oral promise that his post-retirement medical insurance coverage would be permanently, irrevocably, and fully "paid up." We cannot be certain that no such oral promise was ever made;[8] but we are quite certain that Con-

---

7. National Life employees who had already retired were brought up to date by a letter that the President of National Life sent the company's retirees under date of November 18, 1983. The letter explained that American General's benefit programs were going to be adopted for active National Life employees effective January 1, 1984, but that there would be no change in the group life insurance coverage or pension plan benefits for National Life people who had already retired. As far as medical insurance coverage was concerned, the retirees were told that changes were in the offing and that contributions from all National Life retirees might be required beginning July 1, 1984:

> "[B]ecause of the continuing increase in health care costs, it will be necessary to modify your medical insurance, effective July 1, 1984. At that time there will be changes in the form of your medical coverage and *some level of contribution may be required*. The new plan form and contribution level will be consistent with those for all American General retirees." (Emphasis supplied.)

8. Mr. Robert Musto, the lead plaintiff, testified that at no time during his 29 years as an active National Life employee did anyone ever tell him that the company would not make changes in retirement and medical benefits. Mr. Musto, who retired as an assistant secretary of National Life in January of 1983, also testified that he himself never told anyone the company would not change medical benefits after retirement. But Mr. Thomas Gater, a retired National Life agent, testified that in 1975 he asked his district manager, "did he think it would ever change, our benefits after retirement and he said never." And Mr. L.G. Laurence, a retired National Life vice president, testified that at district managers' meetings "I would hit the fact that they were going to have paid-up medical insurance, hospitalization insurance at no cost to them or their wives after retirement." Mr. Laurence conceded, on cross examination, that he could not recall telling anyone that the company would never make a change in benefits after the person retired.

gress, in passing ERISA, did not intend that participants in employee benefit plans should be left to the uncertainties of oral communications in finding out precisely what rights they were given under their plan. That is why ERISA makes it mandatory that "every" plan be established and maintained under "a written instrument." 29 U.S.C. § 1102(a)(1).

The legislative history of § 1102(a)(1) explains that "[a] written plan is to be required in order that every employee may, on examining the plan documents, determine exactly what his rights and obligations are under the plan." H.R. Rep. No. 1280, 93d Cong., 2nd Sess. 4639 at [1974] U.S. Code Cong. & Admin. News 5077. Other courts that have considered this Congressional policy have concluded that the clear terms of a written employee benefit plan may not be modified or superseded by oral undertakings on the part of the employer. See, e.g., *Nachwalter v. Christie*, 805 F.2d 956 (11th Cir.1986) (written employee benefit plans governed by ERISA may not be modified by oral agreements); *Saret v. Triform Corporation*, 662 F.Supp. 312 (N.D.Ill.1986) (oral representations that plaintiff was covered under a benefits plan did not estop company when written plan limited participation to full time employees and plaintiff was not a full time employee); *Audio Fidelity v. Pension Benefit Guaranty Corporation*, 624 F.2d 513 (4th Cir.1980) (oral testimony inadmissible to vary the unambiguous written terms of an ERISA pension plan); *see also Johnson v. Central States, Southeast and Southwest Areas Pension Funds*, 513 F.2d 1173, 1174–75 (10th Cir.1975) (benefits may not be enforced according to informal agreements in a booklet and a letter that are inconsistent with the terms of a written pension plan); *San Pedro Fishermen's Welfare Trust Fund Local 33 v. DiBernardo*, 664 F.2d 1344 (9th Cir.1982) (oral modifications of a written trust fund agreement will not be recognized under § 302(c) of the Labor Management Relations Act). We agree with the conclusion reached in those decisions.

It is not always easy to determine exactly what a benefit plan says even when the language of the plan has been reduced to writing. If the terms of these often complex plans could be made to depend upon evidence as to oral statements that may not have been worded very precisely in the first place, that may have been made many years earlier, and that cannot be proved except through the testimony of lay witnesses whose memories will seldom be infallible and who, being human, may have tended to hear what they wanted to hear, the degree of certainty that Congress sought to provide for would be utterly impossible to attain.

V

The defendant in this case, as the district court indicated, plays three different roles simultaneously. In its corporate role as employer, first of all, the company must see that such benefit plans as it chooses to maintain are designed to further the company's business interests in consonance with the company's obligations to its stockholders. (Among the most significant stockholders in many large corporations today, of course, are trustees of pension plans or other employee benefit plans maintained for people who seldom have any idea of the extent to which they are the true owners of the nation's business enterprises.) In its role as plan administrator, secondly, the company must exercise fiduciary responsibilities in managing and controlling any assets of the plan (except insofar as such assets consist of insurance policies or insurance company assets, see 29 U.S.C. § 1103(a) and (b)). And the company must discharge its administrative duties solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits and defraying reasonable expenses of administration. 29 U.S.C. § 1104(a)(1). In its role as insurance carrier, finally, the company must properly discharge all obligations assumed by it under the terms of the insurance policy, and must comply with a whole panoply of requirements imposed under various state insurance laws.

With respect to the second of these three roles—that of administrator—the district court seems to have believed that there was a breach of fiduciary responsibility: "The unilateral amendments to the retiree's benefits ... reflect overreaching." 615 F.Supp. at 1497 n. 10. The court expressed the view that as administrator of the welfare plan, the company held the insurance policies in a fiduciary capacity and was required to administer the policies "solely in the interests of the retirees." *Id.* at 1502. The court found, moreover, that "the plaintiffs have a substantial likelihood of success on the proposition that [the defendant] was subject to a fiduciary duty with respect to holding and protecting the issued insurance policy covering the medical insurance plan." *Id.* at 1502–03.

If we ignore the problem posed by the fact that "any assets of a plan which consist of insurance contracts or policies" are expressly exempted from the statutory requirement that "all assets of an employee benefit plan shall be held in trust," 29 U.S.C. § 1103(a) and (b), we agree with the district court that the company, in its capacity as administrator of the welfare plan, had a duty to "take and keep exclusive control of the [insurance] contracts, and ... to use prudent care and skill to preserve this property." H.R.Conf.Rep. No. 93–1280, 93rd Cong.2d Sess., reprinted in [1974] U.S. Code Cong. & Admin. News, 5038, 5079. Whatever statutory housekeeping responsibilities the company may have had with regard to the insurance policies, moreover, the company clearly had a duty to pay insurance benefits to those who qualified for such benefits under the policies' terms. But if the district court intended to suggest that the existence of such obligations could somehow prevent the company, in its role as employer, from making any change in the design of its welfare plans other than a change for the "exclusive purpose" of benefiting the plans' participants and their beneficiaries, we believe that the court's understanding of the statute was very seriously flawed.[9]

▬ There is a world of difference between administering a welfare plan in accordance with its terms and deciding what those terms are to be. A company acts as a fiduciary in performing the first task, but not the second. As this court, speaking through Judge Celebrezze, declared in *Moore v. Reynolds Metals Co. Retirement Program*, 740 F.2d 454, 456 (6th Cir.1984),

> "[n]either Congress nor the courts are involved in either the decision to establish a plan or in the decision concerning which benefits a plan should provide. In particular, courts have no authority to decide which benefits employers must confer upon their employees; these are decisions which are more appropriately influenced by forces in the marketplace and, when appropriate, by federal legislation."

Congress, as the Court of Appeals for the Fourth Circuit pointed out in *Sutton v. Weirton Steel Div.*, 724 F.2d 406, 411 (4th Cir.1983), *cert. denied*, 467 U.S. 1205, 104 S.Ct. 2387, 81 L.Ed.2d 345 (1984), "has not prohibited an employer who is also a fiduciary from exercising the right accorded other employers" to amend plan provisions regarding unfunded contingent benefits. Such changes, the court declared, "are not to be reviewed by fiduciary standards." *Id. Cf. Amato v. Western Union International, Inc.*, 596 F.Supp. 963, 968 (S.D.N.Y. 1984) (employer that is also plan administrator "wears two hats," and is only to be judged as a fiduciary when functioning as a plan administrator), *modified*, 773 F.2d 1402, 1416–17 (2d Cir.1985), *cert. dismissed*, 474 U.S. 1113, 106 S.Ct. 1167, 89 L.Ed.2d 288 (1986).

**9.** Mr. Donald S. Grubbs, Jr., a consulting actuary and attorney who was retained to advise the Senate subcommittee that developed ERISA, testified as an expert witness that Congress clearly did not "attempt to preclude the right of employers to reduce benefits" under welfare plans. In response to a suggestion from the district court, Mr. Grubbs testified that nothing in ERISA requires that an employer show, as a condition to making a modification in a welfare plan adverse to the interests of the plan participants, "that the plan is going to go belly up if they don't make this modification." The court remarked from the bench that "I don't put any credence at all in this testimony," but we read the statute just as Mr. Grubbs did.

■ *Moore* and *Sutton* both happen to have involved pension plans, but the principle articulated in those cases applies with at least as much force to welfare plans such as those at issue here. See *Viggiano v. Shenango China Division of Anchor Hocking,* 750 F.2d 276 (3d Cir.1984) (hospitalization plan case citing retirement plan cases). National Life had no fiduciary duty to establish any medical insurance plan, much less one that could never be amended without the approval of those to whom it applied. It is hard to see how the company's express reservation of a right to amend the plan can be said to constitute "overreaching" when a prudent employer, mindful of the possibility that medical costs might skyrocket, could well have decided, if given the slightest reason to suppose that future amendments to the medical insurance coverage could be invalidated under ERISA, not to provide such coverage at all, or to impose the most stringent limits on any coverage provided.

■ The case law, in any event, makes it clear that when an employer decides to establish, amend, or terminate a benefits plan, as opposed to managing any assets of the plan and administering the plan in accordance with its terms, its actions are not to be judged by fiduciary standards. "ERISA's concern is with the elements of a plan and its administration after it has been established rather than to mandate the creation of a program. ERISA does not require an employer to establish a hospitalization plan nor continue it indefinitely." *Viggiano,* 750 F.2d at 279. *See also Amato v. Western Union International, Inc.,* 773 F.2d 1402, 1417 (2d Cir.1985) (company officers "acted on behalf of a corporate employer and not as Plan fiduciaries in amending its pension plan"), *cert. dismissed,* 474 U.S. 1113, 106 S.Ct. 1167, 89 L.Ed.2d 288 (1986); *Cunha v. Ward Foods, Inc.,* 804 F.2d 1418, 1432–33 (9th Cir.1986) (decision to terminate a pension plan was a business decision, not made by company in connection with its fiduciary responsibilities as plan administrator); *Chait v. Bernstein,* 645 F.Supp. 1092 (D.N.J.1986) (decisions of defendant to amend and terminate a pension plan would not be governed by ERISA's fiduciary duties), *aff'd,* 835 F.2d 1017 (3d Cir.1987).

■ The logic of the foregoing cases also disposes of plaintiff's contention that it constituted a breach of fiduciary responsibility for the company to adopt an "escape clause" terminating coverage on an early retiree who became eligible for medical coverage under another employer's group medical plan. If it would not have been illegal for the company to terminate medical coverage for everyone, whether covered elsewhere or not, we do not believe that it was illegal to terminate coverage only for early retirees who could get coverage through another employer.

Relying upon *Northeast Department ILGWU Health and Welfare Fund v. Teamsters Local Union No. 229 Welfare Fund,* 764 F.2d 147 (3d Cir.1985), which held that an escape clause in a *multi-employer* medical insurance plan was unenforceable under ERISA's fiduciary standards, the district court declared that the clause at issue here is unenforceable as a matter of law. *Musto,* 615 F.Supp. at 1503–04. The court's reliance on *ILGWU* was, we believe, misplaced.

In amending a *multi-employer* plan, where the level of contributions of each participating employer has generally been set by collective bargaining, the trustees "affect the allocation of a finite plan asset pool between participants," as defendants point out in their brief, and hence act as plan administrators subject to a fiduciary duty. But when, as here, there is only one employer, there is normally no "plan asset pool" to be affected. In amending a single employer plan, therefore, the company normally acts in its role as employer, not in its role as fiduciary. To the extent that dicta in the *ILGWU* decision suggest that escape clauses in single employer plans are automatically invalid, we respectfully disagree.

As a practical matter, the issue may be unlikely to arise in the future. We are told that recent changes in many state insurance codes have made the new employer's medical coverage primary and the retiree coverage secondary, thus removing much

of the impetus for adoption of escape clauses. (Subsequent to entry of the order appealed from in this case, indeed, as the defendants advise us, the American General welfare plan was amended to eliminate the escape clause of which plaintiffs had complained.)

## VI

The final branch of the order that is under consideration here involves the National Life pension plan, as opposed to the medical insurance plan.

Prior to 1984, a married employee who took early retirement could obtain a pension equal in amount to the "single life" annuity that an unmarried employee would receive, but with the added attraction that if the married employee died before reaching the age of 65, his surviving spouse would receive an annuity (reduced by 50%) for the rest of the spouse's life. If he lived to age 65, the retiree could elect to continue receiving annuity payments on a "single life" basis, in which event there would never be any benefits for the surviving spouse, or the retiree could accept a "joint and survivor" annuity, with benefits for the retiree being reduced in the amount necessary to pay for the survivor's benefits. Because the necessity of making an election was deferred until the retiree turned 65, the spouse had the potential for a free ride until that time. In May of 1984, however, the company announced a change, effective January 1, 1984, under which an election not to accept a joint and survivor annuity had to be exercised upon retirement, and could not be postponed until age 65. The possibility of a "free ride" for spouses thus came to an end.

"Unlike medical insurance benefits," as the district court pointed out, "spousal survivor benefits constitute a form of pension

benefit and are therefore covered by the comprehensive vesting ... provisions under ERISA." *Musto*, 615 F.Supp. at 1504. It is clear, however, that prior to July 30, 1984 (the effective date of the Retirement Equity Act of 1984, P.L. 98–397) the vesting rules of ERISA did not apply to "any value in a plan's joint and survivor annuity provisions to the extent that exceeds the value of what the participant would be entitled to receive under a single life annuity." H.R.Rep. No. 807, 93rd Cong., 2d Sess. *reprinted* in [1974] U.S. Code Cong. & Admin. News 4670, 4726. It is undisputed that the "free ride" spousal survivor benefits at issue here did not constitute part of the value of what a participant would be entitled to receive under a single life annuity, and these spousal survivor benefits therefore did not vest by operation of statutory law. If the spousal survivor benefits were non-terminable, it can only have been because the plan document made them non-terminable.

■ But the district court did not find that the plan document made the early retiree spousal survivor feature non-terminable.[10] What the court found, rather, was that the elimination of this feature "constitutes arbitrary and capricious conduct in violation of [defendant's] fiduciary duties." *Musto*, 615 F.Supp. at 1504. That finding, we believe, was clearly erroneous.

■ Amendments to single-employer pension plans, like amendments to single-employer welfare plans, are not made in the employer's role as fiduciary. *Amato*, 733 F.2d at 1417; *see also Ogden v. Michigan Bell Telephone Co.*, 657 F.Supp. 328 (E.D.Mich.), *appeal dismissed*, 829 F.2d 1126 (6th Cir.1987). There was no fiduciary duty to be broken insofar as the spousal survivor amendment is concerned.

10. The plan document contains an express reservation of "the right to amend the Plan at any time or from time to time," but also provides that "[n]o such action will operate ... adversely to affect the pensions of Members already retired ..." Plaintiffs argue that the amendment in question adversely affected the pensions of a few early retirees who had retired before the amendment was announced, while defendants argue that the no-cost survivor benefit was not

part of the "Member's" pension. The district court not having resolved this question, we decline to express an opinion on it. For the same reason we decline to express ourselves on the question whether, notwithstanding the fact that 26 U.S.C. § 412(c)(8) permits certain retroactive plan amendments that do not reduce the accrued benefits of any participant, ERISA somehow barred the company from giving the particular amendment at issue here retroactive effect.

## VII

Defendants ask us to invoke the pendent jurisdiction doctrine and vacate the certification of the plaintiff class. Plaintiffs maintain that we have no jurisdiction to decide the class certification issue on an interlocutory appeal such as this. *Alexander v. Aero Lodge No. 735, Int'l Ass'n of Machinists and Aerospace Workers,* 565 F.2d 1364, 1370 (6th Cir.1977), *cert. denied,* 436 U.S. 946, 98 S.Ct. 2849, 56 L.Ed.2d 787 (1978), and *Curran v. Merrill Lynch, Pierce, Fenner and Smith,* 622 F.2d 216, 230 n. 14 (6th Cir.1980), *aff'd,* 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982), teach that pendent jurisdiction may be exercised when an interlocutory injunction has been appealed. Given the present posture of the case before us, however, we do not believe that the orderly administration of justice would be furthered materially by addressing the class certification issue at this stage of the proceeding. See *Curran,* 622 F.2d at 230 n. 17.

■ Plaintiffs have moved to dismiss, for want of jurisdiction, the appeal from the supplemental order in which the district court amended its definition of the class and gave "direction" on implementation of the preliminary injunction. Defendants contend that the supplemental order was one "modifying" the preliminary injunction, and thus is appealable under the express provisions of 28 U.S.C. § 1292(a). We agree that the original injunction was "modified," and that we therefore have jurisdiction as to both appeals.

The motion to dismiss the appeal from the supplemental order is DENIED. The orders granting and modifying the preliminary injunction are REVERSED, the plaintiffs having failed to show the requisite likelihood of success on the issues addressed by the district court, and the case is REMANDED for further proceedings not inconsistent with this opinion.