Gordon ETHERINGTON, Duane Chapman, William Gentle, F. Kilburn Visk, Salvatore J. Serio, and Floyd A. Caldini, on Behalf of Themselves and All Persons Similarly Situated, Plaintiffs,

v.

BANKERS LIFE & CASUALTY COMPANY, Defendant.

No. 88 C 10963.

United States District Court, N.D. Illinois, E.D.

Aug. 27, 1990.

Arthur B. Muchin, Joseph M. Gagliardo, Robert H. Brown, Laner, Muchin, Dombrow, Becker, Levil and Tominberg, Ltd., Chicago, Ill., for plaintiffs.

Wilber H. Boies, P.C., Franklyn D. Kimball, Nancy J. Ross, Kenneth A. Grady, McDermott, Will & Emery, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Six former employees of Bankers Life & Casualty Company ("Bankers") bring this action on behalf of themselves and approximately 680 other individuals who retired from Bankers' Home Office before January 5, 1987 and were adversely affected by changes in Bankers' plan for employee and retiree health insurance, Group Policy 778 (the "Plan"). Plaintiffs bring this action under Employee Retirement Income Security Act of 1974 ("ERISA") § 1132(a)(1)(B)[1]—they claim that Bankers violated ERISA by not honoring promises it had allegedly made to plaintiffs as to (1) the rates that they would be charged for health insurance during their retirement (in Count 1) and (2) the health insurance benefits and limits that would apply to them while in retirement (in Count 2).

Bankers has moved for summary judgment under Fed.R.Civ.P. ("Rule") 56 on the ground that the Plan's unambiguous language reserved to Bankers the right to make the changes complained of by plaintiffs. Plaintiffs have countered with their own Rule 56 motion, urging that Bankers did not reserve that right to itself, so that the application of other basic contract principles to the undisputed facts requires judgment in plaintiffs' favor. For the reasons stated in this memorandum opinion and order, Bankers' motion is granted and plaintiffs' motion is denied.

### Facts[2]

Since at least 1973 the Plan has prescribed the health insurance benefits of (1) Bankers' Home Office employees and their dependents and (2) retired persons who had been Home Office employees and the dependents of those retirees. In each of 1973, 1978 and 1984 the Plan was restated, with any intermediate changes being set forth in various Endorsements.[3] Under each restated Plan, Bankers is both "Insurance Company" and "Policyholder." Each restated Plan required Policyholder to make premium payments to Insurance Company in exchange for Insurance Company's paying out on appropriate claims made by "Individuals"—defined as Bankers' employees and retirees who participate in the Plan.[4] All three versions of the Plan specifically provided that contributions from Individuals were required.[5]

---

1. All further citations to provisions of ERISA (which spans 29 U.S.C. §§ 1001–1461) will take the form "Section—," referring (as does the citation in the text) to the Title 29 numbering rather than to ERISA's internal section numbering.

2. Familiar Rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is called on to draw all "reasonable inferences, not every conceivable inference" in the light most favorable to the nonmovant (*DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 329 (7th Cir.1987)). Where as here cross-motions are involved, that principle demands a dual perspective that sometimes causes the denial of both motions. Because this case really involves the simple interpretation of express contractual language, however, the Janus-like task of drawing reasonable inferences in each party's favor wherever appropriate is greatly simplified.

3. In the interest of convenience, the term "Plan" will be used to refer to each version of the Plan in existence from time to time, rather than speaking of "Plans" as a plural noun.

4. Not all Bankers employees and retirees were required to participate in the Plan. Instead it was merely one option open to them. To be a covered Individual, the employee or retiree had to fill out an application and in some circumstances make timely premium payments (more on that important point later in the text).

5. Those provisions appeared in the "Insuring Provisions—Individuals" and "Insuring Provisions—Dependents" sections of each Plan. Thus the 1973 Plan states: "INDIVIDUALS CONTRIBUTIONS. Contributions from Individuals are required" (Ex. 18). Both the 1978 and 1984 versions of the Plan (Exs. 21 and 28) say precisely the same thing but have six dashes separating the words "are" and "required" (that is done simply to fill in the blank space in the printed form where the word "not" could be typed in if the Plan were wholly noncontributory).

Since 1973 employees and eligible retirees have contributed only a portion of the premiums required to be paid for their insurance by Bankers (as Policyholder) to Bankers (as Insurance Company). That amount has ranged from a zero employee-retiree contribution to the present target of an approximate 50% contribution by retirees and their dependents.

"Individuals" who qualify for group insurance are defined by the 1973 Plan (Ex. 18, "Insuring Provisions—Individuals"):

"Individual" shall mean anyone who is an active, fulltime employee working a minimum of thirty (30) hours per week or is retired after fifteen years or more of continuous employment with the Policyholder and is not gainfully employed elsewhere.

"Retired" was defined this way in the 1973 Plan:

The term "retired" means fulfilling the requirements for early, disability or normal retirement, as defined under the Company's Funded Contributory Retirement Plan, irrespective of whether the Individual is participating in that plan.

This provision of the 1978 Plan deals with the continuation of retiree insurance (Ex. 21, "Insuring Provision—Individuals"):

To qualify for continuation as a retired employee as specified above, the Individual (a) must have been insured hereunder immediately prior to cessation of active work, and (b) the Individual's number of years of continuous employment plus years of age on the date insurance would otherwise terminate must equal at least 75.[6]

There is a similar provision in the 1984 Plan (Ex. 28, "Insuring Provisions—Individuals"):

To qualify for continuation as a retired employee as specified above, the Individual (a) must have been insured hereunder immediately prior to cessation of active work, and (b) if the Individual's employment date or rehire date is prior to November 1, 1983 his/her number of years of continuous employment plus years of

age on the date insurance would otherwise terminate must equal at least 75. . . .

Though each version of the Plan itself contained no specific information as to what amounts Individuals were required to contribute towards premiums, some plan summaries and booklets distributed to employees between 1973 and 1984 specified the share of premiums to be borne by group plan participants during the effective period of the Plan. Until February 1984 a retired employee paid the same share of premium as specified in the booklet that had been in effect at the time of his or her retirement, and he or she correspondingly received benefits at the levels in effect at his or her retirement date. Thus multiple premium and benefit levels were in effect for retirees, depending on the respective dates of their retirement.

In February 1984 Bankers changed that policy as to retirees. It began to require all retirees (regardless of their dates of retirement) to make premium contributions and receive benefits at levels identical to those then in effect for active employees. For some retirees (those who retired between 1975 and 1978) that represented a percentage increase in the share of premium they paid, while for others (those who retired between 1978 and 1984) that was the first premium payment ever required of them for individual coverage. In 1987 Bankers again modified the retiree premium policy and began to require contributions from retirees in excess of those required of active employees.

February 1984 witnessed not only a change in the premium contribution policy for retirees but also changes in the benefits provided to Individuals under the plan. At that time the "basic major medical component" was being replaced with a "comprehensive medical component," which had deductibles and a co-insurance provision not part of the earlier program. Similarly 1987 witnessed the institution of a dental deductible and 1989 ushered in new increases

---

**6.** [Footnote by this Court] In Bankers' parlance the subsection (b) provision is commonly referred to as the "Rule of 75." This Court will adopt that usage throughout this opinion.

in the medical deductible and changes in some reimbursement rules. All those changes resulted in reductions in the level of benefits to most retirees.

In accordance with the stipulation of the parties, this Court certified two classes of plaintiffs (subject to further order of this Court) for purposes of objecting to Bankers' actions in its ongoing modification of the Plan. For Count 1 the certified class comprises:

All retired Home Office employees of Defendant, or the personal representatives of such employees, who retired prior to January 5, 1987, who were eligible for group insurance benefits under defendant's "Rule of 75," who were adversely affected by changes initiated by the Company on or about February 1, 1984, and subsequently, to require retiree premium contributions to Group Insurance Plan No. 778.

For Count 2 the certified class comprises:

All retired Home Office employees of Defendant, or the personal representatives of such employees, who retired prior to January 1, 1987, who were eligible for group insurance benefits under defendant's "Rule of 75," who were, and have been, adversely affected by changes initiated by defendant in levels of medical benefits in Group Insurance Plan No. 778.[7]

### Premium Obligations

Plaintiffs contend that the Plan itself is silent on employee/retiree premium share contributions and that ordinary contract principles must therefore apply to determine the parties' respective rights and obligations in that regard. On that predicate P.Mem. 11 argues that by Bankers' statements in various Group Insurance Benefit Booklets ("Benefit Booklets"), other written communications and oral representations:

Specifically, Bankers promised its employees group health insurance upon retirement under the Rule of 75 at specified contribution rates. The employees accepted that promise by continued employment. If Bankers amended the promise during the employee's active tenure and the employee continued to work, the employee accepted the amendment. The last promise made and accepted prior to an individual's retirement fixed the rights and obligations of Bankers and the employee after that employee retired. Bankers breached its duties under the Employee Retirement Income and Security Act (ERISA) when it required different share of premium payments from individuals after they retired.

Although never stated in precisely this way, plaintiffs' theory is that their rights under the Plan (in terms of both required premiums and benefits) *vested* for each qualified employee on the date of his or her retirement. P.Mem. 11 contends (emphasis in original omitted and other emphasis added):

It should be emphasized that this is not a case that in any way challenges Bankers' right to change premium contribution or benefits for employees still working for it or for persons who did not elect to retire after they received notice of Bankers' first reservation of rights to change premium and benefit levels in December 1986. Rather it is a case brought because *retirees, in consideration for their many years of service and loyalty, had their rights fixed as of their retirement. Their rights are not affect-*

7. [Footnote by this Court] As the later analysis in this opinion reflects, some time in 1984 might be viewed as the only arguable watershed date when the type of information given to employees as to their retirement benefits changed materially. That was the first time when Bankers issued a document that specifically identified itself as a "summary plan description"—and that document (as explained later in the text) explicitly referred to the primacy of the Plan language itself in determining Bankers' and employees' relative rights and obligations. Later discussion also explains why that difference in documentation creates no difference in legal consequences as between people who retired before the 1984 date and those who retired afterwards. For the present, however, it need only be noted that the named class plaintiffs include people in both those categories, so that there is no need to be concerned about subclasses or about considerations of "typicality" or adequacy of representation under Rule 23(a)(3) and (4).

*ed by any subsequent changes in active employee rights.*

But that very emphasis on plaintiffs' part underscores the essential poverty of their argument. As they would have it, an active employee's decision to continue work implicates no acceptance of a contractual offer of fixed premium levels during that continued employment. Yet they say that same decision somehow creates an acceptance that is forever binding on the employer if the employee should retire before a new premium level is set, even though the employer remains free to make premium changes as to everyone who stays employed. But clearly no principled distinction exists between the "acceptances" of the two posited employees (acceptances manifested by their both continuing to work) that should allow one's action to bind the employer while the other's does not.

Thus Bankers is quite right in labeling plaintiffs' contention as a thinly-disguised (or undisguised) argument for vested rights under the Plans. On that score *Ryan v. Chromalloy American Corp.*, 877 F.2d 598, 603 (7th Cir.1989) recently summarized the law governing the vesting or nonvesting of rights under employee welfare plans like the one at issue here:

> ERISA requires that "[e]very employee benefit plan ... be established and maintained pursuant to a written instrument." 29 U.S.C. § 1102(a)(1). Through those instruments, the parties are free to subject such welfare benefits to vesting requirements not provided by ERISA, or they may reserve the power to terminate such plans. As the Sixth Circuit has stated in *Hansen v. White Farm Equipment Co.*, 788 F.2d 1186 (6th Cir.1986), "the parties may themselves set out by agreement or by private design, as set

out in plan documents, whether retiree welfare benefits vest, or whether they may be terminated." *Id.* at 1193. *See also Musto v. American General Corp.*, 861 F.2d 897, 907 (6th Cir 1988).

Unfortunately for plaintiffs, a review of the Plan documents makes it obvious that no vesting of any Plan provisions was contemplated or agreed to by Bankers for its employee welfare program.

■ To begin with non-controversial documents, all three versions of the Master Group Plan (Exs. 18, 21, 28) state in the "General Provisions" section under the heading "The Contract—Changes":

> This policy may be changed at any time or times by written agreement between the Insurance Company and the Policyholder, without the consent of any Individual or other person.

That provision is not limited in the scope of changes that it authorizes, and while it does not directly advert to changes in the premium structure or outright termination of the policy, its all-inclusive language is certainly broad enough to encompass such matters.

Another set of potentially relevant documents consists of the Group Insurance Plan Booklets ("Booklet Certificates") periodically distributed by Bankers. Those booklets describe the Plan and serve as the employees' certificates of insurance.[8] Each Booklet Certificate expressly states (Ex. 19, the 1973 version; Ex. 24, the 1978 version; and Ex. 27, the 1982 version):

> The Group Policy determines all rights and benefits which are summarized in this booklet.

Each such booklet's "Special Information" section provides that a qualified retiree may continue his or her insurance,[9] *and*

---

**8.** Each of those booklets states on page 1:

> Your Group insurance plan is described in this booklet and it is your certificate while you are insured. You should become familiar with the benefits available to you.

**9.** Thus the 1973 Booklet Certificate's "Special Information" section states:

> You are also eligible to continue your insurance with the exception of any Weekly Disability Insurance if you retire after 15 years

or more of continuous employment with the policyholder and are not gainfully employed elsewhere.

And the 1978 and 1982 Booklet Certificates' "Special Information" sections state:

> If your employment ceases and you qualify as a "retired employee" as defined below, your insurance may be continued, with the exception of any Weekly Disability Insurance, provided you continue to submit the required premium payments.

those same sections clearly state (emphasis added):

> YOUR INSURANCE TERMINATES on the Monday following termination of employment, on the date you are no longer eligible *or the date the Group Policy terminates.*[10]

Because those booklets served as the employees' certificates of insurance, it is certain that every individual who had Plan coverage received a copy.

Plaintiffs nowhere refer to those passages dealing with termination. Instead they point to various Benefit Booklets (Exs. 20, 22, 25, 26, 30), which highlight benefits provided under the Plan but plainly do not (with one notable exception discussed below) purport to be comprehensive summaries of the Plan. Those Benefit Booklets contain information about the weekly cost of coverage for different types of insurance (individual, family, health, life, etc.) and an overview of coverage. All those Benefit Booklets also refer to the ability of eligible employees to continue insurance after retirement, but none of them either has the termination language contained in the Booklet Certificates or otherwise speaks of possible termination at all.

 Those Benefit Booklets, argue plaintiffs, represent specific offers from Bankers to *provide* insurance at the quoted rates—offers that were accepted by the employees' continued work. And as stated earlier, plaintiffs' position is that the last such offer made and accepted before an employees' retirement fixed the rights of both parties in *contractual* terms. Because "nothing in *any* Booklet informs employees that after they retire the Company might require them to contribute a different amount towards their insurance premium" (P. Mem. 4), plaintiffs conclude that Bankers had not reserved the right to make such a change and was therefore bound by

its representations regarding premiums in the Benefit Booklets. Two problems plague that theory.

First, although plaintiffs correctly say that Bankers nowhere specifically informed employees that their premiums could change after they retired, that overlooks the more important point: Nothing in the Benefit Booklets[11] or any other Plan document directly stated or suggested that the respective parties' rights became fixed at the time of employee retirement. Surely Plan documents that expressly permit out-and-out termination of the Plan must also include the lesser alternative of Plan changes, including Bankers' reservation of the right to alter premiums required from Plan beneficiaries. To argue otherwise would truly undermine plaintiffs' interests. If instead the only alternatives available to Bankers were the status quo or termination, any situation in which Bankers viewed the economics of the benefits program as burdensome (or even distasteful) would leave open to it only one liability-free course: total termination of the Plan, thereby completely eviscerating any and all benefits that this action seeks to protect. That forced killing of the goose instead of accepting fewer golden eggs[12] would make little sense for the plaintiff class.

 In essence, plaintiffs' argument boils down to the idea that there is something magical about retiring that transforms the Policyholder–Individual relationship and prevents any of the kinds of future changes that are allowable in all other situations. But *Howe v. Varity Corp.*, 896 F.2d 1107, 1110 (8th Cir.1990) (citations omitted) teaches:

> [T]he mere fact that employee welfare benefits continue into retirement does not indicate that the benefits become vested for life at the moment of retire-

---

**10.** [Footnote by this Court] More accurately, the 1973 Booklet Certificate reads "effective the Monday following ..." rather than "on the Monday following...." But that one-word difference connotes no difference in meaning.

**11.** This opinion's use of that capitalized term as a convenient shorthand label should not obscure the obvious nature of those booklets as

informational summaries, not at all as comprehensive statements of the Plan's terms.

**12.** This of course is a metaphor for allowing Bankers to alter the respective premium burdens as between Bankers and the covered Individuals.

ment. No inference of an intent to vest can be presumed from the fact that the benefits are retirement benefits. Indeed, the benefits at issue here are "retirement benefits" in a technical sense only. Unlike pension benefits, coverage under the welfare benefit plan does not begin at an employee's retirement. Rather, as plaintiffs themselves strenuously argue, the welfare benefits simply continue when an employee retires. Nothing in the documents establishes retirement as a vesting point.

Thus, given the absence of clear language to the contrary, nothing makes Bankers' obligations to the retiree any different from its obligations to the active employee—and a provision allowing for the termination or modification of benefits must apply in the same way to both classes of covered individuals.

Second, the documents that plaintiffs would characterize as the binding offers fixing their premium obligations are *not* official plan documents. As explained in *Moore v. Metropolitan Life Insurance Co.*, 856 F.2d 488, 492 (2d Cir.1988), a court should first look to the official plan documents to determine whether or not the plan included a private design in favor of vesting or whether instead the employer reserved its rights to make changes in the plan:

> Congress intended that plan documents and the SPDs exclusively govern an employer's obligations under ERISA plans. This intention was based on a sound rationale. Were all communications between an employer and plan beneficiaries to be considered along with the SPD's as establishing the terms of a welfare plan, the plan documents and the SPDs would establish merely a floor for an employer's future obligations. Predictability as to the extent of future obligations would be lost, and, consequently, substantial

disincentives for even offering such plans would be created.

*Howe*, 896 F.2d at 1110 makes it clear that only if official plan documents are ambiguous on the vesting question may extrinsic evidence be relied upon to show the intentions of the parties one way or the other; accord, *Ryan*, 877 F.2d at 602. Obviously, then, it becomes crucial to identify which of the plethora of papers proffered by the parties constitute "official plan documents."

Both sides agree on the obvious ends of the spectrum: Each version of the Plan itself is an official plan document, while a number of letters and interoffice memoranda are not. However, the parties seem to part company [13] over which of the many booklets distributed to employees constitute official plan documents.[14]

■ As already noted, even without distinguishing between the Booklet Certificates and the Benefit Booklets, it does not appear that Bankers manifested a clear intent to be bound forever by the premium prices quoted in the Benefit Booklets. If however *all* of those materials were to be treated as official plan documents, it might be argued that the Benefit Booklets' failure to include language about policy termination, or to refer back to the actual Plan itself, would render the totality of the official plan documents ambiguous, in turn requiring reference to unofficial documents (the earlier-mentioned letters and memos). But that argument is blocked by the fact that the Benefit Booklets do not meet the Section 1022(b) requirements for plan descriptions and summary plan descriptions. Hence they cannot properly be treated as "official" and cannot be used to create an ambiguity in the otherwise unambiguous set of plan documents.

---

**13.** This tentative language is used because neither side's briefing has made any explicit arguments about what do and do not constitute official plan documents. Accordingly the stated disagreement is inferentially gleaned from their reliance on totally different sets of documents.

**14.** Distinguishing among the various booklets is complicated by the fact that the "Table of Contents" to Defendant's Exhibits ascribes titles to those documents that do not always conform to the titles on the documents themselves and that at times suggest similarities or differences between the referred-to documents that do not necessarily exist.

*Alday v. Container Corp. of America,* 906 F.2d 660, 665 (11th Cir.1990) recently found that a similar benefit booklet did not constitute an official plan document:

> It is clear, however, that the booklet does not fulfill the requirements for plan descriptions and summary plan descriptions as set out at 29 U.S.C. § 1022. The booklet does not describe the plan's terms, specify its benefits or coverage, or define eligibility requirements or limitations. It fails to give plan participants any of the information they would need in order to participate in CCA's program for retiree health insurance.

Many of the same things may be said of the Benefit Booklets relied upon by plaintiffs in this action. Except for the 1984 Benefit Booklet (Ex. 30, discussed below), the Benefit Booklets provide only a cursory summary of some of the available benefits and limitations and provide a one-paragraph explanation of eligibility. They fail to give specifics of coverage or coverage limitation, and they provide only sketchy information—or no information at all—on how to make claims under the Plan or on how to seek remedies for denied claims. Indeed, they fail even to identify the organization through which benefits are provided.[15]

From a common-sense point of view as well as in contractual terms, perhaps the most powerful indication that the Benefit Booklets were not intended or understood to be definitive and comprehensive in scope is that every employee also received the obviously more thorough Booklet Certificates. Juxtaposing those documents highlights the less-than-official character of all the Benefit Booklets except the one described in the next paragraph—documents that on their face (even without comparison to the Booklet Certificates) are obviously *not* comprehensive and do *not* impress any reasonable reader as having any of the hallmarks of an official plan summary.

■ Unlike the other Benefit Booklets that plaintiffs point to, the 1984 version (Ex. 30) does contain extensive information regarding all elements of the Plan. In fact, that document occupies more than 70 pages (in contrast to the 8 pages for each of the other Benefit Booklets) and specifically says on its title page:

> This booklet is the summary plan description of the healthcare, disability, and survivor benefits in your Bankers benefits program.

Ex. 30 contains all the information required by Section 1022(b) and as such must be treated as an official plan document.[16] But that single document cannot carry the weight that plaintiffs have attempted to rest on the group of Benefit Booklets collectively.[17]

■ As for Ex. 30 itself, while that Benefit Booklet does contain specific premium information and does not contain the termination provisions contained in the Booklet Certificates, it *does* clearly state at page ii:

> Copies of the master group insurance policies are available for review in Human Resources. Should there be any conflict between this summary and the master policies, the master policies will govern.

Thus Ex. 30, like the Booklet Certificates, incorporated the master policies by refer-

---

**15.** While that type of information may seem obvious in a case like this where the employer is itself the insurer, Section 1022(b) specifically requires that information to be provided in any official plan document.

**16.** That conclusion is bolstered by the June 13, 1984 memorandum regarding Group Insurance Booklets (Ex. 31), which clearly identifies the 1984 Benefits Booklet as the "Summary Plan Description" provided in conjunction with the Booklet Certificate. But on the other hand plaintiffs cannot derive *too* much mileage from that memorandum: It does not automatically carry with it the negative implication that none of the previous *Booklet Certificates* was an official plan document. After all:

> 1. Never before 1984 had those Booklet Certificates been accompanied by comprehensive summary descriptions.
>
> 2. In fact the very existence of the June memorandum suggests that the format of the information being provided was new and called for such an explanation.

**17.** If anything, the dramatic change in size and scope calls for precisely the opposite inference—that the earlier versions were *not* official plan documents.

ence (and by definition that incorporation includes the general provision permitting policy changes). That being true, Ex. 30 cannot be said to make the other Plan provisions ambiguous.

■ While no case this Court has uncovered is on all fours with the present factual situation, the body of case law read as a whole strongly militates in favor of upholding Bankers' right to change the premium structure for retirees. This case closely resembles *Moore*, 856 F.2d at 491–92 (footnote omitted), where the court said:

> Metropolitan clearly reserved in the plan documents and in the SPDs the right to amend or terminate the plans at issue. Plaintiffs are therefore driven to argue that the "contract" between themselves and Metropolitan "consists of the totality of the representations made to the employees by the Company, and the actions of the employees in accepting those representations by remaining with the Company."

Here, as in *Moore*, that position cannot prevail.[18] Bankers' insurance policy clearly provides for any change to be made to that policy without the consent of covered Individuals, and every official booklet states expressly that the terms of the policy itself governs. Further, all of the official booklets—except for the 1984 (Ex. 30) Benefit Booklet which expressly refers to the master policies as the prevailing documents—clearly indicate that benefits can be terminated on the termination of the policy in its entirety. No ambiguity lurks beneath the surface meaning of those statements.

■ Although to be sure no documents explicitly say that Bankers reserves the right to raise the premium contribution level of retirees, there is no reason to require such specificity in reservations of rights. Just because other policies may have had more express rights-reserving language,[19] that does not mean such express language is always required as a prerequisite to a reserved right. Rather the appropriate inquiry is whether an individual reading the official documents provided in relation to *this* Plan could reasonably believe that once he or she retired the amount of his or her premium obligations was immunized from change. For the reasons already outlined, that conclusion cannot reasonably be extracted from those documents.

■ Plaintiffs also try to avoid the result inevitably compelled here by relying on the following specific language in Bankers' 1987 Booklet Certificate (Ex. C at i):

> The Policyholder reserves the right at its sole discretion to amend, reduce, suspend or terminate (in whole or in part) the Group Insurance Program at any time the Policyholder determines it to be necessary or appropriate. The Policyholder also reserves the right to adjust the employee's share of the cost to continue coverage.

Because Bankers had failed to include such specific language in earlier Plan documents, P. Mem. 25–26 asserts that Bankers had not previously reserved the right to change premium contributions. But as has just been observed, such specific language—though obviously preferable as a

---

**18.** Both *Moore, id.* at 492 and *Anderson v. John Morrell & Co.*, 830 F.2d 872, 875 (8th Cir.1987) explicitly reject the idea that ordinary offer-and-acceptance contract principles, if sought to be based on informal communications followed by employee action, can create obligations under an ERISA welfare plan. Those cases, like others, emphasize that Congress intended ERISA itself to govern the obligations of parties and to supplant state common-law principles in this specific area.

**19.** For example, the operative document in *Musto v. American General Corp.*, 861 F.2d 897, 901–02 (6th Cir.1988) provided:

> The Company reserves the right to determine new premium contributions from time to time and at any time.

That language of course made it easy to find an explicit reservation of rights to implement premium changes in that case. But it would not be an apt method of contract construction for a court to use that language—something obviously unknown to the lay members of the plaintiff class—as a contrast to the language in the Plan, thus creating a negative inference in this case.

sure-fire insurance policy[20] against lawsuits such as this one—is not obligatory in reserving rights to make changes in benefits programs. And the fact that Bankers later adopted such more specific language does not fairly create the inference that until that time it had reserved none of those rights.

 Nor does the fact that until February 1984 Bankers maintained retiree premium contribution levels at the levels in place at the time of the employees' respective retirements cast doubt on its right to institute changes thereafter as it deemed necessary or desirable. First off, that bit of information falls into the extrinsic evidence category, making any purported reliance upon it inappropriate given the lack of ambiguity in the official plan documents. Second, even if that evidence were to be considered, it would not sway this Court's assessment of this case. As *Howe*, 896 F.2d at 1110 said in a parallel situation:

> Merely because defendants chose to exempt retirees from plan changes in the past does not mean that defendants considered themselves forever bound to do so.

In sum, the official plan documents unambiguously reserve to Bankers the right unilaterally to make changes in the Plan as to active employees and retirees alike. That reservation includes all types of adverse changes, up to and including termination of the program in its entirety. For that reason Bankers' changes in the premium structure for retirees does not violate any provision of ERISA, and Bankers is entitled to judgment as a matter of law on Count 1.

### *Retiree Benefits*

 Unlike the premium contribution structure, the level of retiree benefits is directly addressed in official plan documents. Both the 1978 and 1984 versions of the Plan state in their "Insuring Provisions—Individuals" sections:

**20.** Pun intended.

**21.** There is of course no question that a *current* Bankers employee is subject to any and all Plan changes. Plaintiffs' effort to put themselves

> [I]f an Individual retires, the plan of benefits and limits of insurance in force at retirement, except as otherwise specifically provided, may be continued with the exception of any Weekly Disability Benefits, until premium payments are discontinued.

From that language and the balance of the Plan provisions, P. Mem 29 (emphasis in original) argues:

> [N]othing in the Plan "specifically" authorizes changes in retiree benefits. Thus, even to *attempt* to accomplish that end, it must delete the foregoing "Insurance [sic] Provisions" language which *prevents* changes in benefits for retirees only.

That attempt at creative policy reading cannot withstand scrutiny. As already noted, the "General Provisions" section of each version of the restated Plan specifically states:

> This policy may be changed at any time or times by written agreement between the Insurance Company and the Policyholder, without the consent of any Individual or other person.

That provision authorizes changes in *any* aspect of the Plan, making no exception for retiree benefits. Contrary to plaintiffs' objections, giving that provision its natural meaning does not render the Insuring Provision as to retiree benefits nugatory or illusory. Instead the Insuring Provision clearly means that retirees shall receive the benefits in effect at their respective retirements unless and until they are notified of specific changes in those benefits and limitations as implemented by the agreement of the Policyholder and the Insurance Company. Read (as it must be) as a totality, the policy in no way *prevents* changes in retiree benefits.[21]

Here again, in an attempt to justify looking to extrinsic evidence to justify their position, plaintiffs try to create ambiguity where there is none. P. Mem. 30 urges

into a preferred position exposes their claim as one for a type of vesting nowhere called for by the terms of the Plan.

that the lack of specificity in the General Provisions language as to what aspects of the Plan may be changed renders the entire Plan ambiguous as to retiree benefits. In support of that position, plaintiffs point to the more specific reservation-of-rights language in the plans at issue in *Moore* and *Musto*, urging that those cases create a specificity requirement that Bankers' language fails to meet.

But neither of those cases identifies such a requirement and, as already stated, this Court refuses to adopt one now. Nothing could be less ambiguous than a provision allowing for *any* change in the Plan generally. If more specificity were demanded, employers could seek to protect themselves from obligations they never intended to undertake only by trying to anticipate and provide for a whole host of eventualities that may never come to pass.[22] Not only would that lead to even longer and less comprehensible plan documents, but it might well create a general disincentive to provide welfare programs in the first instance.

In summary, the Plan language clearly authorized Bankers to make the now-complained-of changes in retiree benefits. Bankers is also entitled to a judgment as a matter of law on Count 2.

### *Estoppel*

One final issue requires attention before this opinion comes to an end. At the eleventh hour, by way of their Supplementary Memorandum in Support of Their Motion for Summary Judgment and in Opposition to Defendant's Motion ("P. Supp.Mem."), plaintiffs have sought to invoke *Black v. TIC Investment Corp.*, 900 F.2d 112 (7th Cir.1990):

1. to bolster their attempted reliance on basic contract offer-and-acceptance principles in arguing for summary judgment on Count 1 and

2. to argue for the first time that even if Bankers did effectively reserve its right to make the complained-of changes, it should be estopped from enforcing those changes as against the retirees.

That legal equivalent of the end-of-the-game Hail Mary pass cannot achieve either of its intended purposes.

First, P. Supp.Mem 1 is flat-out wrong when it asserts that in *Black* our Court of Appeals "essentially agreed with Plaintiffs' contentions that contract principles regulate the rights of the parties in regards [sic] to Count I of the Complaint (premium payments)." Nothing in *Black*'s discussion of the *equitable* principle of estoppel (900 F.2d at 114–15) can be read as commenting one way or the other on the propriety of applying traditional offer-and-acceptance contract notions, in the manner urged by plaintiffs, to employer-employee relations under ERISA welfare programs. *Black* does not even touch on the issue of interpretation of ERISA welfare programs except to note that they are not subject to strict vesting requirements. Certainly it contains no statements that cast any doubt on the reasoning or result outlined in the "Premium Obligations" section of this opinion.

Second, as to the estoppel argument itself, two major roadblocks (each independently sufficient) prevent its application in plaintiffs' favor in this case. Neither of those roadblocks requires extensive discussion.

■ As an initial matter, plaintiffs' Amended Complaint did not raise the estoppel issue at all, so that it is not properly before this Court for resolution on this Rule 56 motion. But even if plaintiffs had not thus waived their right to rely on estoppel, *Black* would still not provide them with the comfort they seek.

■ After *Black*, 900 F.2d at 114–15 had surmounted the threshold hurdle of deciding that estoppel principles could indeed operate in this area of the law, it defined those substantive principles in the

---

**22.** And of course any employer who did that would thereby create the unwarranted risk of a negative inference if any future contingency were to arise that had *not* been adequately crystal-balled.

 

conventional way (*id.* at 115 (citations omitted)):

> An estoppel arises when one party has made a misleading representation to another party and the other has reasonably relied to his detriment on that representation.

Unlike *Black,* there is absolutely no evidence of detrimental reliance in this case.[23] In *Black* the employer's misrepresentation caused Black to give up something of value (two months' continued employment on salary) in reliance on the false promise that the employer intended to pay him severance pay. By contrast, even on the unsupported assumption that Bankers in fact misled plaintiffs into thinking that they would forever receive fixed benefits at a fixed premium rate, there is no showing of detrimental reliance on that claimed "representation."

After all, the choice that would have confronted plaintiffs had they specifically been told about the situation that they now complain was left undisclosed was really a Hobson's choice from their perspective: They could have continued work as they did and ended up with the diminished benefits or they could have left their jobs and ended up with no benefits whatever. Hence even on the arguendo assumption that plaintiffs did rely on those asserted "misrepresentations" in continuing to work for Bankers, no facts have been advanced that could support a reasonable inference that such reliance injured plaintiffs in any real way.

Thus no effective estoppel argument is available to plaintiffs either. Their motion for summary judgment is denied for that reason, as well as for all the other reasons stated earlier in this opinion for a ruling in Bankers' favor.

### Conclusion

There are no genuine issues of material fact, and Bankers is entitled to a judgment as a matter of law. This action is dismissed.

---

**23.** This is quite apart from the question whether such reliance—if it could be established at all—could be found "reasonable," given the plain meaning of the Plan language as already discussed at length. But once again plaintiffs will be given the benefit of an arguendo assumption as to reasonableness, simply to enable this Court to complete the analysis.