968 F.2d 1218
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Gordon ETHERINGTON, Duane Chapman, William Gentle, F.
Kilburn Visk, Salvatore J. Serio, and Floyd A.
Caldini, on Behalf of Themselves and All
Persons Similarly Situated,
Plaintiffs-Appellants,
v.
BANKERS LIFE & CASUALTY COMPANY, Defendant-Appellee.
 No. 90-3125.
 United States Court of Appeals, Seventh Circuit.
 Argued Sept. 24, 1991.
Decided July 21, 1992.
 
 Before POSNER and KANNE, Circuit Judges, and ALBERT J. ENGEL, Senior Circuit Judge.*
 
 ORDER
 
 1
 A class consisting of retired employees of Bankers Life & Casualty Company ("Bankers") appeals a summary judgment dismissing an action it brought under § 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B).[1] Section 502 provides a cause of action to individuals who seek to enforce or clarify their rights under the terms of an employee welfare benefit plan.[2] The retirees seek here to enforce two promises regarding their health insurance benefits. Because of an absence of proof that Bankers made the promises alleged, the district court granted summary judgment. Etherington v. Bankers Life & Cas. Co., 747 F.Supp. 1269 (N.D.Ill.1990). We agree and affirm.
 
 BACKGROUND
 
 2
 The retirees' claim is two-fold. They claim: (1) Bankers charges retirees more for their health insurance than it agreed it would; and, in return, (2) Bankers provides less coverage than it promised.
 
 A. Facts
 
 3
 The relevant facts are undisputed. At least since 1973, Bankers has provided health insurance to active and retired employees of its own home office according to the terms of Group Policy 778 (the "Plan"). Those terms are set forth in the Master Group Plan--which is the policy itself, and undisputedly the principal plan document--and in ancillary Plan documents, which Bankers issues from time to time. Bankers is in the insurance business and, not surprisingly, is self insured. Thus under the Plan Bankers acts both as "Policyholder" and as "Insurance Company."
 
 
 4
 The first of the retiree's two claims challenges the amount they must contribute to the insurance premiums that Bankers, as "Policyholder," pays to itself as "Insurance Company." Each of three versions of the Master Group Plan (Bankers initially issued the Policy in 1973 and reissued it in 1978 and 1984) has specifically provided that individual employees covered under the Plan must contribute a share of these premiums. The policy has never specified, however, the amount of the individual's share. Instead, Bankers frequently changed required contributions from its employees. Since Bankers initiated the Plan, it has required contributions at rates ranging from zero to approximately 50% of the premium. In addition, Bankers has twice changed the rule for determining the premium share borne by employees who have retired. It instituted the first such change in 1984. Until that year, each retiree contributed a proportion of the premium at the level that was in effect for active employees at the time of his or her retirement. In 1984, however, Bankers announced uniform contribution requirements for all employees; it began to require all retirees--regardless of when they retired--to make premium contributions at levels in effect for currently active employees. Bankers again changed the rule on January 5, 1987, when it began to require all retirees to contribute at levels that exceeded those in effect for active employees.
 
 
 5
 Both changes resulted in increased contribution requirements for employees who retired before January 5, 1987. Those retirees maintain that Bankers' 1984 and 1987 modifications to the Plan constitute a breach of its promise to provide them health insurance at specified contribution rates that became fixed for each employee at the time he or she retired. Bankers, they argue, by virtue of representations made in Plan summaries and booklets distributed to employees before 1987, promised to limit its demands for contributions from employees who retired before 1987 either to the level in effect for active employees when they retired, or (depending on the date of retirement) to the level in effect for currently active employees. By requiring them to contribute at higher levels, the retirees argue, Bankers' 1987 modification broke that promise.
 
 
 6
 In Count 2, employees who retired before January 1, 1987 assert that Bankers broke a similar promise regarding the level of medical coverage it would provide under the Plan. Bankers' 1984 modifications applied not only to premium contributions, but to benefits as well. Until 1984, Bankers provided an eligible retired employee with medical coverage at the level that was in effect for active employees at the time he or she retired. In 1984, however, Bankers decided to provide them only the coverage offered to currently active employees. Because coverage has eroded in some respects--Bankers has, for example, introduced new deductibles and a co-insurance provision since 1984--Bankers' unwillingness to freeze benefit levels at retirement diminished the coverage afforded most retirees.
 
 
 7
 The retirees maintain that the Plan contained a promise to freeze benefit levels. Unlike the schedule of premium contributions, the level of retiree benefits is explicitly addressed in the Master Group Plan itself. The 1978 and 1984 versions, for example, provide that "if an Individual retires, the plan of benefits ... in force at retirement ... may be continued...." That provision, argue the retirees, obligates Bankers not to reduce coverage. By reducing coverage, they explain, the 1984 modification constitutes a breach of that obligation and, as a result, is actionable under ERISA.
 
 B. District Court Opinion
 
 8
 The district court dismissed the retirees' claims that Bankers, by raising its contribution requirements and by reducing its medical coverage, failed to honor promises made in the Plan. Bankers, the court explained, made no such promises, and its modifications to the Plan, therefore, do not violate ERISA. 747 F.Supp. at 1279, 1280.
 
 
 9
 The retirees argued to the district court and on appeal that because the Plan itself is silent regarding the amount of employee contribution required, the court must look to ordinary contract principles to determine the parties' respective rights and obligations with respect to the contributions. Under principles of contract law, the retirees maintain, Bankers offered to provide health insurance at specific contribution rates each time it issued a Plan description that specified individual contribution requirements, and the active employees implicitly accepted these offers by their continued work. Thus, a contract was formed. When Bankers amended its promises by adjusting the rates, the retirees add, they accepted the amendment by continuing to work. Once they retired, however, the retirees contend, the last contribution rate bargained for in this manner fixed their rights under the Plan and Bankers could no longer adjust the contribution requirements.
 
 
 10
 The district court equated this argument by the retirees with the assertion that upon retirement their rights to insurance at established rates of contribution had vested under the Plans. It found this vesting argument patently contrary to existing authority. The court first cited Howe v. Varity Corp., where the Eighth Circuit refused to presume that employee welfare benefits vest merely because they continue into retirement. 896 F.2d 1107, 1110 (8th Cir.1990) ("No inference of an intent to vest can be presumed from the fact that [welfare] benefits are retirement benefits."). The district court also relied upon Ryan v. Chromalloy American Corp., 877 F.2d 598, 603 (7th Cir.1989), where the Seventh Circuit joined the Sixth to hold that ERISA permits parties to set out by agreement whether retiree welfare benefits vest, but insists that any such agreement be set forth in plan documents. The district court also cited Moore v. Metropolitan Life Insurance Co., 856 F.2d 488, 492 (2d Cir.1988), where the Second Circuit held that "Congress intended that plan documents and the SPDs [Summary Plan Descriptions] exclusively govern an employer's obligations under ERISA plans." This authority, the district court reasoned, commands that the task before it was to determine whether Plan documents set forth an agreement that obligates Bankers to provide insurance at contribution rates that are fixed at retirement. In other words, the court wrote, the appropriate inquiry was whether an individual employee reading the official Plan documents could reasonably believe that his or her premium obligations became fixed at retirement.
 
 
 11
 After reviewing Bankers' Plan documents, the court flatly rejected the retirees' "vesting" argument because Bankers neither contemplated nor agreed to vesting of any plan provisions. 747 F.Supp. at 1274. To the contrary, its official Plan documents expressly and unambiguously reserve to Bankers the right unilaterally to make changes in the Plan, including any that are adverse to retirees. Id. at 1279. In support, the court pointed principally to the "all-inclusive" language Bankers used to reserve its rights in the controlling plan document. The Master Group Plan provides:
 
 
 12
 This policy may be changed at any time or times by written agreement between the Insurance Company and the Policyholder, without the consent of any Individual or other person.
 
 
 13
 That language, the court reasoned, is certainly broad enough to authorize changes in the premium structure. Moreover, the court adds, other official Plan documents expressly inform employees that where those documents conflict with the the Master Group Plan itself, the latter document governs. Each of Bankers' Group Insurance Plan Booklets--plan descriptions that Bankers periodically distributed to all employees--for example, expressly states that Master Group Plan "determines all rights and benefits." The court also noted that these booklets, with one exception, inform individuals that their insurance terminates in the event that the Group Policy itself terminates. Surely, the court reasoned, plan documents that expressly permit termination of the entire Plan must also include the lesser alternative of Plan changes such as increased contribution requirements. In brief, the court concluded, official Plan documents plainly indicate that Bankers expressly reserved a unilateral right to modify the Plan.
 
 
 14
 The district court also rejected the retirees' reliance on Bankers "Benefit Booklets" as evidence of a contract for fixed rates of contributions. Benefits Booklets, which Bankers frequently updates and distributes to its employees, announce current contribution requirements and provide a brief overview of coverage. The retirees argue that these booklets, by announcing premium shares, represent specific offers from Bankers to provide insurance at the quoted rates. The offers become binding obligations, they add, once the employees accept them by continuing to work, and thus cannot be modified after an employee retirees. The court rejected this argument on two grounds. First, it noted that, like the Plan documents described above, nothing in the Benefit Booklets indicated that Bankers intended to be permanently bound by the premium prices quoted or that the parties' rights somehow became fixed at retirement. Second, the court determined that the Benefit Booklets do not qualify as official Plan documents, and, accordingly, are irrelevant to the vesting question unless official plan documents are ambiguous on that score. 747 F.Supp. at 1276 (citing Moore v. Metropolitan Life Insurance Co., 856 F.2d 488, 492 (2d Cir.1988)). All but one of the Benefits Booklets are obviously not comprehensive descriptions of the Plan, the court explained, and lack any of the hallmarks of an official plan summary; they fall well short of the statutory requirements for plan descriptions and summary plan descriptions as set out in § 102(b) of ERISA, 29 U.S.C. § 1022(b). Moreover, the court added, the lone Benefit Booklet that arguably is sufficiently comprehensive to qualify as a summary plan description does not make the other Plan provisions ambiguous. That Booklet, the court explained, explicitly incorporates the Master Group Plan, which, of course, contains Bankers' reservation of the right unilaterally to modify or terminate the Plan.
 
 
 15
 Thus, the court concluded, nothing in any Plan document can reasonably be contrued to state or suggest that the parties rights became fixed at retirement, and Bankers was entitled to summary judgment on Count 1.
 
 
 16
 The district court offered similar grounds for disposing of the retirees' second claim. In Count 2, the retirees complained that Bankers 1984 modifications to the Plan, which resulted in a reduction in medical coverage, broke Bankers' binding promise to maintain coverage at the levels in effect when the employee retired. Bankers made that promise, argue the retirees, in the "Insuring Provisions" of the 1978 and 1984 versions of the Master Group Plan. Those provisions read:
 
 
 17
 [I]f an individual retires, the plan of benefits and limits of insurance in force at retirement, except as otherwise specifically provided, may be continued ... until premium payments are discontinued.
 
 
 18
 That language, the retirees argue, precluded Bankers from reducing their benefit levels.
 
 
 19
 The district court succinctly rejected that interpretation. Noting that it was required to read the policy as a totality and to construe the Insuring Provisions in light of the all-inclusive language Bankers used to reserve its right to modify the policy in the aforementioned General Provisions (i.e., "[t]his policy may be changed at any time ... without the consent of any Individual"), the court reasoned that the Insuring Provisions clearly mean that the retirees receive benefits at the specified levels until they are notified of specific changes made by Bankers. The General Provisions, the court reiterated, authorizes changes in any aspect of the Plan, including retiree benefits. There is no requirement, the court added, that Bankers reserve its rights using more specific language. As a result, it concluded, Bankers was entitled to summary judgment on Count 2.
 
 DISCUSSION
 
 20
 Summary judgment is appropriate where two conditions are satisfied: There must be no genuine issue of material fact and the moving party must be entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). We have recognized that actions brought under § 502(a)(1)(B) of ERISA, like other cases centering on the interpretation of a contract, are particularly suited to disposition on summary judgment if the pertinent provisions of the contract are unambiguous. Ryan, 877 F.2d at 602. Whether a contract is ambiguous, as well as the meaning of an unambiguous contract, are, of course, questions of law. Accordingly, we review the district court's construction of Bankers' Group Policy 778, together with its concomitant determination that Bankers is entitled to judgment as a matter of law, de novo. Id.
 
 
 21
 We agree with the district court's decision. The pertinent provisions of the Plan documents unambiguously reserve to Bankers the right to increase the retirees' share of the premium payments and to decrease the coverage supplied in return.
 
 A. Premium Contributions
 
 22
 The district court accurately characterized the retirees' claim for premium shares that became fixed at retirement as an argument for vesting. Congress did not include employee welfare benefit plans under ERISA's vesting requirements. Instead, the statute permits the parties to set out by agreement whether rights under a benefit plan vest at retirement. Ryan, 877 F.2d at 603; In re White Farm Equipment Co., 788 F.2d 1186, 1193 (6th Cir.1986).
 
 
 23
 The retirees argue that the district court relied on the wrong documents when it determined that Bankers had not agreed to provide health insurance to the retirees at fixed contribution levels. In their view, the Benefits Booklets--brief summaries that Bankers distributed to its employees--constitute the critical documents detailing Bankers' promises regarding contribution levels. The policy itself (i.e., the Master Group Plan), they argue, is immaterial since it is silent regarding the amount of employee contribution required. Moreover, they add, the Benefits Booklets themselves meet virtually all of the statutory requirements for a summary plan description, as set forth in 29 U.S.C. § 1022(b), and thus constitute official Plan documents. These Plan documents, the retirees conclude, define their contractual agreement with Bankers. In the alternative, they argue, even if the Benefits Booklets are not Plan documents, they nonetheless govern because the allocation of the premium costs is not a Plan matter, but a personnel matter. Unlike Plan matters, such as the overall size of the premium, they explain, premium share is not subject to the agreement between the insurance company and the policyholder (here both Bankers). Because premium share is not a Plan matter, they add, the Benefits Booklets, rather than the policy itself, constitute the authoritative source of the terms of the agreement.
 
 
 24
 Under either theory, the retirees assert that the Benefits Booklets define Bankers' obligation to the retirees regarding the allocation of premium shares. From this they further assert that the allocations specified in the Booklets constitute a contractual promise to which they manifest their agreement by their continued employment. Once an employee retires, they add, Bankers can no longer modify its promise because the retiree can no longer furnish consideration. Bankers is thus bound by the offer it made in the Benefits Booklets that were current at the time the employee retires.
 
 
 25
 The district court correctly determined that where, as here, employees claim that their rights under a benefit plan vest at retirement, it should look first to official plan documents to ascertain the parties' agreement regarding vesting; a court may not presume that welfare benefits vest. Extrinsic evidence, moreover, is relevant only to resolve ambiguities in the plan documents. Ryan, 877 F.2d at 603; Hansen, 788 F.2d at 1193; Moore, 856 F.2d at 492. However, Bankers' principal Plan document, the Policy itself, is not ambiguous. The Master Group Plan clearly provides that it "may be changed at any time or times ... without the consent of any Individual." As the district court reasoned, this reservation of rights is sufficiently expansive to authorize Bankers' complained-of changes in the premium structure. Moreover, Bankers' Group Insurance Plan Booklets, comprehensive plan summaries regularly distributed to all employees, incorporated that reservation of rights by informing employees that the Policy itself "determines all rights and benefits." We find it difficult to disagree with the district court's position that these plan summaries, by notifying employees that Bankers may unilaterally decide to terminate the Plan outright, plainly reserve to Bankers the lesser alternative of instituting Plan changes, such as increased contribution requirements.
 
 
 26
 The retirees also fail to confront squarely the absence of any direct indication in Bankers' communications--plan documents or otherwise--that Bankers promised to keep retiree premium levels in lock-step with those charged to employees. They acknowledge that neither the policy itself, nor the Group Insurance Plan Documents, include any such indication. But the retirees fail fully to recognize that the Benefits Booklets--on which they rely--contain no language promising unchanged premium or benefit levels. Although the booklets do announce the particular contribution and benefit levels in effect when a given booklet is issued, they contain no promise to continue those levels in the future or that the levels become fixed at retirement. Thus, even if we assumed that they are relevant or even controlling (which we do not, for reasons noted in the following paragraph), the Benefit Booklets do not evince the alleged promise on which the retirees' argument rests.
 
 
 27
 Nor do we find merit in the retiree's argument that the Benefits Booklets control. The retirees cite no authority, and we are aware of none, that supports their assertion that the allocation of the premium costs is not a Plan matter, but a "personnel matter," and that, as a result, the parties need not confine themselves to official plan documents when setting forth their respective rights regarding premium share. The Eleventh Circuit, for example, holds that "any retiree's right to lifetime medical benefits at a particular cost can only be found if it is established by contract under the terms of the ERISA-governed benefit plan document." Alday v. Container Corporation of America, 906 F.2d 660, 665 (11th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 675, 112 L.Ed.2e 668 (1991). We, too, find no merit to the suggestion that ERISA--"a comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans," Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 90 (1983)--does not govern issues, such as premium share, that concern only the employer and employees, and not the insurer. Quite simply, premium share is an ERISA plan matter, especially where, as here, the the Master Group Plan itself expressly provides that covered individuals must contribute a portion of the premiums. Accordingly, ERISA controls, and plainly commands that official plan documents exclusively govern Bankers' obligations. It is clear, moreover, that Bankers' Benefit Booklets do not qualify as plan descriptions or summary plan descriptions as defined at 29 U.S.C. § 1022. As the district court noted, since the booklets provide only a cursory summary of the benefits available and of the requirements for eligibility, and even less information regarding the claims process, they do not fulfill the requirements for official plan documents, which are set out in § 1022(b). Thus, the Benefits Booklets do not govern. Any promise Bankers made regarding contribution levels and benefit levels must be set forth in official plan documents, such as the Master Group Plan or the Group Insurance Plan Booklets.
 
 
 28
 In brief, the absence of any evidence in official plan documents (or elsewhere) that Bankers promised to fix premium levels at retirement, together with Bankers' broad reservation in the principal Plan document of the right unilaterally to make changes in the Plan, gravely undermines the retirees' position. While the retirees argument rests principally on their assertion that the policy is silent regarding premium share, we agree with the district court that the policy, by expressly providing Bankers both the right to require premium contributions and the expansive right unilaterally to amend or terminate the Plan, authorizes Bankers to increase the retirees' premium contributions. It is of no consequence, finally, that Bankers did not specifically provide for the right to change premium shares. As the district court recognized, ERISA does not require such particularized reservations of rights clauses, and to do so would be impractical.
 
 B. Benefit Levels
 
 29
 We likewise find little merit to the retiree's second allegation. In contrast to the dispute over premium shares, the dispute over benefit levels involves no disagreement as to which document controls. The parties agree that the policy itself is the sole source setting forth their agreement regarding retirement benefits. The dispute merely involves the interpretation of that document.
 
 
 30
 The retirees argue that the Insuring Provision of the Master Group Plan obligates Bankers to provide them benefits at levels that are not inferior to those in effect when they retired. The provision is straightforward:
 
 
 31
 (c) if an Individual retires, the plan of benefits and limits of insurance in force at retirement, except as otherwise specifically provided, may be continued....
 
 
 32
 The retirees contend that this language constitutes a promise that requires Bankers to maintain benefit levels unless the policy specifically provides otherwise. Bankers violated this provision, they argue, when it reduced retiree benefits in 1984. We disagree.
 
 
 33
 Standing alone, the Insuring Provision merely provides that the benefits "may be continued" and does not promise that Bankers will not reduce retiree benefit levels. Again as the district court observed, the retirees' interpretation ignores the all-inclusive language Bankers used to reserve its unilateral right to amend the policy. As noted above, each version of the Master Group Plan states that the policy "may be changed at any time or times by [Bankers], without the consent of any Individual." In light of that broad reservation, which clearly encompasses the right to alter benefit levels, we cannot construe the Insuring Provision as a promise by Bankers not to reduce benefits.
 
 
 34
 We hold that nothing in Bankers' Plan documents promises either benefit levels or premium contributions that become fixed at retirement. Rather, Bankers expressly and unambiguously reserved the right to reduce coverage and to increase premium contribution at any time. Because this action is premised on an allegation that Bankers made such promises, the district court's order granting summary judgment in favor of Bankers is AFFIRMED.
 
 
 
 *
 Honorable Albert J. Engel, Senior Circuit Judge for the United States Court of Appeals for the Sixth Circuit, sitting by designation
 
 
 [1]
 The district court's opinion is reported at 747 F.Supp. 1269 (N.D.Ill.1990)
 
 
 [2]
 Congress expressly defines the term "employee welfare benefit plan," as used in ERISA, to include health benefits. 29 U.S.C. § 1002(1)